## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DURASYSTEMS BARRIERS INC., a Canadian corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Consolidated Case No. 1:19-cv-01388-SLD-JEH |
| VAN-PACKER CO., an Illinois corporation, and JEREMIAS, INC., a Georgia corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

### ORDER

Plaintiff DuraSystems Barriers Inc. ("DuraSystems") accuses Defendants Van-Packer

Co. ("Van-Packer") and Jeremias, Inc. ("Jeremias" and together with Van-Packer,

"Defendants") of infringing U.S. Patent No. 10,024,569 (the "'569 Patent").  Now before the

Court are the parties' respective claim construction briefs, ECF Nos. 31, 36, 41, as well as their

respective motions for leave to file under seal various materials in support thereof, ECF Nos.

33, 37.  For the reasons that follow, the Court DEFERS consideration of the claim terms

Defendants assert are indefinite, ADOPTS the constructions identified below, and DENIES the

motions for leave to file under seal.

### BACKGROUND

### I.      Procedural History

On December 3, 2019, DuraSystems filed its original complaint, which alleged two

claims for patent infringement against Van-Packer, one with regard to the '569 Patent and

another to a patent no longer at issue.  *See generally* Compl., ECF No. 1.  The day before,

DuraSystems brought a materially identical lawsuit against Jeremias in the United States District

Court for the Northern District of Georgia.  *See* Compl., 4:20-cv-04069-SLD-JEH, ECF No. 1.

On March 25, 2020, that action was transferred to this Court, *see* Order Transferring Case, 4:20-cv-04069-SLD-JEH, ECF No. 8, and on April 16, 2020, it was consolidated with this case, s*ee* Apr. 16, 2020 Text Order.  The Clerk then filed DuraSystems's amended complaint, ECF No. 17, which names both Van-Packer and Jeremias.  *See* Apr. 16, 2020 Text Order (directing the Clerk to file DuraSystems's proposed amended complaint, which was attached to the parties' motion to consolidate, ECF No. 16).  Defendants' amended answer was filed on November 2, 2020, ECF No. 30.  The Court issued a scheduling order on April 13, 2020.  *See* Apr. 13, 2020 Text Order; Disc. Plan, ECF No. 14.[1]  Fact discovery closed on December 11, 2020, and expert discovery (which shall include the exchange of expert reports and expert depositions) has not yet occurred.  *See* Apr. 13, 2020 Text Order; Disc. Plan 2–3.

Defendants filed their opening claim construction brief, ECF No. 31, and motion to seal, ECF No. 33, on December 23, 2020, as well as the parties' joint appendix, ECF No. 32. DuraSystems filed its answering brief, ECF No. 36, and motion to seal, ECF No. 37, on February 5, 2021, and Defendants filed their reply brief, ECF No. 41, on March 3, 2021.  DuraSystems filed the parties' status report and joint claim construction chart, ECF No. 42, on March 10, 2021.  The Court conducted a *Markman* hearing on June 21, 2021.  *See* June 21, 2021 Min. Entry.

---

[1] The parties' discovery plan, which the Court adopted in the April 13, 2020 scheduling order, *see* Apr. 13, 2020 Text Order, heavily cites the Local Patent Rules for the United States District Court for the Northern District of Illinois.  This Court has not issued any local rules specific to patent cases and acknowledges its sister court's rules provide helpful guideposts in this action.  But they are not controlling: All deadlines in this case, whether they were set in the discovery plan or have yet to be set, are subject to the Court's discretion.

## II.     The '569 Patent

Flammable or hazardous gases, vapors, or particles are generated in commercial and industrial buildings and must be captured and transported to a place where they can be discharged.  U.S. Patent No. 10,024,569 col. 1 ll. 13–17 (filed Oct. 10, 2013), J.A. 0012, ECF No. 32-1.  Ventilation ducts are typically routed throughout these buildings; however, when such ducts must transport flammable or hazardous materials, they must be fire-rated—"capable of minimizing the transfer of heat through or across the duct walls."  *Id.* col. 1 ll. 20–36, J.A. 0012.

The utility of fire-rated ducts can be illustrated by the role they play in commercial kitchens.  In a commercial kitchen, exhaust ducts are configured to capture grease-laden air over deep fryers and grills.  *Id.* col. 1 ll. 40–41, J.A. 0012.  Such air "is extremely flammable, and must be transported through the building to an exterior area where it can be safely discharged."  *See id.* col. 1 ll. 42–44, J.A. 0012.  In fact, it is so flammable, a minor kitchen fire "could enter the exhaust duct and quickly spread throughout the duct system."  *Id.* col. 1 ll. 44–47, J.A. 0012.  Therefore, any potential duct fire "must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building."  *Id.* col. 1 ll. 47–50, J.A. 0012.

Fire-rated exhaust duct systems are usually fabricated in sections, which are shipped to an installation location and welded together to form conduit sections.  *Id.* col. 1 ll. 61–65, J.A. 0012.  These systems "typically require the installation of an additional gypsum fire-rated enclosure . . . around the duct."  *Id.* col. 2 ll. 1–4, J.A. 0012.  This "add[ed] step" represented a "known shortcoming[] in the art," *see id.* col. 2 ll. 5–8, J.A. 0012, which was overcome by chimney manufacturers who "introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems, *see id.* col. 2 ll. 7–10, J.A. 0012.  But their "characteristic

round profile significantly limits the volume of air that can be vertically carried in conventional building footprints" and "is often too large to fit into conventional ceiling . . . spaces or dimensions." *Id.* col. 2 ll. 12–16, J.A. 0012.

Enter the '569 Patent, a general illustration of an embodiment of which can be found below.



FIG. 1

*Id.* fig. 1, J.A. 0003.[2]  It concerns a "fire-rated modular duct assembly, and improvements therein, suitable for exhausting flammable or hazardous gases, vapour, and the like," *id.* col. 1 ll. 7–9, J.A. 0012, and "suitable for pre-fabrication and configured for assembly in the field," *id.* col. 2 ll. 24–25, J.A. 0012.  According to an embodiment, this duct assembly comprises "individual duct sections which are factory fabricated and then mechanically assembled on site," *id.* col. 8 ll. 16–17, J.A. 0015, and the individual sections "are connected together to form longer sections and runs to create a fire-rated exhaust duct system in a building or other type of facility for exhausting or moving flammable or hazardous gases, vapours and materials from an

---

[2] Reference 100 points to a "fire-rated modular exhaust duct"; references 110(a) and (b) point to "exhaust duct sections or modules"; and reference 120 points to a "mechanical joint" that "connect[s] or couple[s] together" "individual exhaust sections."  '569 Patent col. 3 l. 67–col. 4 l. 7, J.A. 0013.

originating source, e.g. an exhaust hood . . . to a location where the flammable or hazardous gases, vapours or materials can be safely discharged," *see id.* col. 8 ll. 22–28, J.A. 0015.

Specifically, and according to an embodiment, the '569 Patent describes a modular, fire-rated duct assembly comprising "two or more exhaust duct modules," each of which having an inner duct liner, an outer casing, and a void between them. *Id.* col. 2 ll. 26–31, J.A. 0012. This void includes "one or more thermal spacers" configured to maintain the liner and the casing "in a spaced relationship so that . . . insulation material" occupies it. *Id.* col. 2 ll. 31–35, J.A. 0012. Flange connectors are attached to the modules and "configured to form a field assembly junction for coupling respective ends of . . . [the] modules to form a single exhaust duct run." *Id.* col. 2 ll. 36–44, J.A. 0012. Field assembly junctions are in turn encased by joint encasement sections, which are field connectable to each of the modules. *Id.* col. 2 ll. 44–46, J.A. 0012. According to another embodiment, the inner duct liner is "formed with a generally rectangular cross-section," and the outer casing is "formed with a generally rectangular cross-section . . . sized to substantially surround" the inner duct liner. *Id.* col. 2 ll. 50–54, J.A. 0012.

## DISCUSSION

### I.    Claim Construction

### A.    Legal Standard

"The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation marks omitted). Indeed, this process "serves to define the scope of the patented invention and the patentee's right to exclude." *See HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1367 (Fed. Cir. 2017). But a court need only construe claim language that is disputed. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803

(Fed. Cir. 1999). "Claim construction is ultimately an issue of law . . . ." *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1328 (Fed. Cir. 2019) (citation omitted).

"[T]here is no magic formula or catechism" when it comes to claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc). But the Federal Circuit has nevertheless articulated general principles that guide courts, including the cardinal principle "the words of a claim are generally given their ordinary and customary meaning." *Id.* at 1312 (quotation marks and citations omitted). Perhaps more importantly, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [a "POSITA"] in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313 (citations omitted). In addition, a POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.*

Sometimes, the ordinary meaning of a claim as understood by a POSITA may be immediately apparent to lay judges, and claim construction involves nothing more than applying the generally accepted meaning of commonly understood words. *Id.* at 1314. But courts are usually not so lucky. When the meaning of a claim term is not readily apparent, courts look to "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean." *Id.* (quotation marks omitted). These sources are "the words of the claims themselves, . . . the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quotation marks and citations omitted).

Obviously, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* Also instructive are the context in which a claim term is used in the

6

asserted claim and other claims in the patent, both asserted and unasserted.  *Id.*  (citation

omitted).  Indeed, since claim terms are normally used consistently throughout a patent, "the

usage of a term in one claim can often illuminate the meaning of the same term in other claims."

*Id.*  Differences among claims can be useful as well.  *Id.*

As part of a "fully integrated written instrument," though, claims "must be read in view

of the specification."  *Id.* at 1315 (quotation marks omitted).  The specification is not only

relevant, it is often dispositive: "[T]he specification is the single best guide to the meaning of a

disputed term."  *Network-1 Techs., Inc v. Hewlett-Packard Co.*, 981 F.3d 1015, 1022 (Fed. Cir.

2020) (quoting *Phillips*, 415 F.3d at 1315).  For example, while courts "normally do not interpret

claim terms in a way that excludes disclosed examples in the specification," *Verizon Servs. Corp.*

*v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (citation omitted), "limitations

from the specification are not to be read into the claims," *Comark Commc'ns, Inc. v. Harris*

*Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (citation omitted).  Ultimately, "the purposes of the

specification are to teach and enable those of skill in the art to make and use the invention and to

provide a best mode for doing so."  *Phillips*, 415 F.3d at 1323 (citation omitted).

If it is in evidence, a court should consider a patent's prosecution history, which consists

of the record of the proceedings before the United States Patent and Trademark Office (the

"PTO") and includes the prior art cited during a patent's examination.[3]  *Id.* at 1317 (citations

omitted).  The prosecution history and the specification are similar in that they both show how

the PTO and the inventor understood the patent and were both created by the inventor in trying

to explain and obtain it.  *Id.*  However, the prosecution history usually "lacks the clarity of the

---

[3] The parties jointly submitted the '569 Patent's prosecution history into the record.  *See generally* J.A. 0018–0426, ECF Nos. 32-2–32-3.

7

specification" because it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Id.* (citation omitted).  Overall, while the prosecution history is useful because it can show how an inventor understood the invention, it is not as prominent as the claims and the specification in the claim construction analysis.  *See id.* (citations omitted).

 "In some cases . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) (citation omitted).  Such evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."[4]  *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 799 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1317).  For example, expert testimony can "provide background on the technology at issue, . . . explain how an invention works, . . . ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSITA], [and] . . . establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318 (citations omitted).  But "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court," and a court "should discount any expert testimony that is clearly at odds with" the intrinsic evidence. *Id.* (quotation marks omitted).  In sum, while extrinsic evidence "can help educate the court regarding the field of the invention and can help the court determine what a [POSITA] would understand claim terms to mean," *id.* at 1319, it is "less

---

[4] Both parties rely on extrinsic evidence.  For example, both DuraSystems and Defendants rely on expert testimony. *See* Decl. of Tony Crimi ("Crimi Decl."), Pl.'s Br. Ex. AA, ECF No. 36-1 (testifying for DuraSystems); Decl. of Barry M. Cheek, Opening Br. Ex. B, ECF No. 31-3 (testifying for Defendants).

reliable" than intrinsic evidence, *id.* at 1318, and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," *id.* at 1319.

### B.     Analysis

At issue are the following nine claim terms: (1) "fire rated," (2) "specified fire rating," (3) "compressible insulation material," (4) "thermal spacers," (5) "thermally isolating," (6) "thermal spacers thermally isolating," (7) "exhaust duct module," (8) "joint encasement section," and (9) "joined directly."  Joint Claim Construction Chart.  Defendants argue the first three claim terms are indefinite and do not propose constructions thereof; DuraSystems disagrees and provides accompanying constructions.  *See id.* at 2.  Constructions of the other six claim terms have been presented.  *Id.* at 2–3.

### 1.     The Allegedly Indefinite Claim Terms

Defendants argue the terms "fire rated," "specified fire rating," and "compressible insulation material" are indefinite.  *Id.* at 2.  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The doctrine of indefiniteness derives from 35 U.S.C. § 112, under which a patent's claims, "evaluated from the perspective of someone skilled in the relevant art" "at the time the patent was filed" "in light of the patent's specification and prosecution history," must "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Id.* at 908, 910 (emphasis omitted) (citations omitted); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) ("It has long been understood that a patent must describe the exact scope of an invention and its

manufacture . . . .").  This definiteness requirement "mandates clarity, while recognizing that absolute precision is unattainable."  *Nautilus*, 572 U.S. at 910.

But what is not clear is whether the Court should address Defendants' indefiniteness arguments now, at the claim construction stage, or later, at the summary judgment stage.  The Federal Circuit has not determined whether indefiniteness determinations should be made during claim construction.  But while it has "acknowledged that an indefiniteness analysis . . . is inextricably intertwined with claim construction" and "training questions of indefiniteness on individual claim terms is a helpful tool," the key question regarding indefiniteness is "whether the *claims*, not particular *claim terms*," meet the *Nautilus* indefiniteness standard.  *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1231–32 (Fed. Cir. 2016) (emphases added) (quotation marks and citations omitted).  Moreover, "the Federal Circuit's statements that indefiniteness is intertwined with claim construction mean only that the [c]ourt must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness, and not that the [c]ourt must determine indefiniteness during the claim construction proceedings."  *ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190-EDL, 2002 WL 1892200, at *15 (N.D. Cal. Aug. 15, 2002), *amended,* 2003 WL 21033555 (N.D. Cal. Jan. 10, 2003), *aff'd*, 401 F.3d 1340 (Fed. Cir. 2005).  And it "ha[s] certainly not endorsed a regime in which validity analysis is a regular component of claim construction."  *Phillips*, 415 F.3d at 1327.

Many lower courts have not endorsed such a regime either; in fact, "district courts frequently decline to rule on indefiniteness at the *Markman* stage," *0912139 B.C. Ltd. v. Rampion USA Inc.*, CASE NO. C18-1464JLR, 2019 WL 3426058, at *16 (W.D. Wash. July 30, 2019) (collecting cases), and numerous courts have "opine[d] that rulings on indefiniteness are

10

inappropriate at claim construction," *Kaneka Corp. v. JBS Hair, Inc.*, No. 3:10-cv-01430-P, 2012 WL 5364699, at *5 (N.D. Tex. Oct. 31, 2012) (collecting cases).

But should this Court join them, it would face another issue: how to proceed here given Defendants have not proposed alternative constructions for the claim terms they assert are indefinite.  The Federal Circuit has not prescribed a solution, although some district courts have tried.  *See infra* Section I.B.1.b.

For the following reasons, the Court defers (a) considering Defendants' indefiniteness contentions and (b) construing the claim terms attacked as indefinite—"fire rated," "specified fire rating," and "compressible insulation material"—until the summary judgment stage.

a.     Indefiniteness Shall Be Addressed at the Summary Judgment Stage

The Court defers consideration of Defendants' indefiniteness assertions given the "[s]everal well-settled principles . . . [that] tend to discourage rulings on indefiniteness at the *Markman* stage."  *See CSB-Sys. Int'l Inc. v. SAP Am., Inc.*, Civil Action No. 10-2156, 2011 WL 3240838, at *17 (E.D. Pa. July 28, 2011).  First, while indefiniteness is a question of law to which "[g]eneral principles of claim construction apply," *see HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 688 (Fed. Cir. 2019) (citation omitted), indefiniteness is an "invalidity defense[] [that must] be proven by clear and convincing evidence," *see Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1009 (E.D. Wis. 2017) (citing *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017)) (other citation omitted); *see also Am. GNC Corp. v. LG Elecs., Inc.*, Case No. 17-cv-01090-BAS-BLM, 2018 WL 400346, at *10 (S.D. Cal. Jan. 12, 2018) (finding this "demanding evidentiary requirement counsels that consideration of indefiniteness challenges would be best addressed separately from the claim construction hearing" (citation omitted)); *cf. Uretek Holdings, Inc. v. YD W. Coast Homes, Inc.*, Case No:

8:15-cv-472-T-36JSS, 2016 WL 3021880, at *3 (M.D. Fla. May 26, 2016) ("[T]he burden of

proof is higher for establishing indefiniteness than it is for establishing a term's construction.").[5]

Second, and more importantly, while claim construction proceedings give meaning to claim

terms, "indefiniteness invalidates the claims entirely." *See 3-D Matrix, Inc. v. Menicon Co.*,

Civil Action No. 14-cv-10205-IT, 2016 WL 111410, at *13 (D. Mass. Jan. 11, 2016) (citation

omitted); *see also Nautilus*, 572 U.S. at 901 ("[A] patent is invalid for indefiniteness if its claims,

read in light of the specification delineating the patent, and the prosecution history, fail to

inform, with reasonable certainty, those skilled in the art about the scope of the invention.").

Citing these principles, "district courts throughout the country have generally been

reluctant to consider whether a patent is indefinite at the claim construction phase, rather than at

the summary judgment phase." *See Junker v. Med. Components, Inc.*, CIVIL ACTION No. 13-

4606, 2017 WL 4922291, at *2 (E.D. Pa. Oct. 31, 2017) (collecting cases); *Gilead Scis., Inc. v.*

*Mylan Inc.*, Civil Action No. 1:14CV99, 2015 WL 1534067, at *2 (N.D. W. Va. Apr. 6, 2015)

(noting "many judges have elected to wait and tackle indefiniteness at the summary judgment

stage" due to "the high burden of proof on the party challenging a patent claim for

indefiniteness," "the fact that a claim is not indefinite merely because the parties dispute its

meaning," and "the dispositive effect of a ruling on indefiniteness" (collecting cases)); *see also*

*2-Way Computing, Inc. v. Nextel Fin. Co.*, No. 2:11-cv-00012-JCM-PAL, 2012 WL 4846145, at

*20 (D. Nev. Oct. 9, 2012) (noting "it is more appropriate to defer these [indefiniteness]

arguments until summary judgment because they are potentially dispositive and would invalidate

---

[5] Though, this evidentiary standard only applies to factual issues underlying indefiniteness disputes, not legal ones. *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (citation omitted); *cf. Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 114 (2011) (Breyer, J., concurring) (emphasizing that when evaluating patent invalidity claims, "the evidentiary standard of proof applies to questions of fact and not to questions of law," explaining "[m]any claims of invalidity rest, however, not upon factual disputes, but upon how the law applies to facts as given" and that "[w]here the ultimate question of patent validity turns on the correct answer to legal questions," the clear and convincing standard "has no application").

the patent, and because of the burden of proof required to show indefiniteness"), *amended on reconsideration on other grounds sub nom. 2-Way Computing, Inc. v. Sprint Nextel Corp.*, No. 2:11-CV-12 JCM (PAL), 2013 WL 2218010 (D. Nev. May 17, 2013).

The Court is similarly reluctant and finds Defendants' indefiniteness arguments should be decided on a motion for summary judgment.  Indefiniteness decisions here could be dispositive.  For example, since the term "fire rated" is included in every independent claim in the '569 Patent, *see, e.g.*, '569 Patent col. 8 l. 47, J.A. 0015, indefiniteness rulings could invalidate the entire patent.  Indeed, as Defendants noted at the *Markman* hearing, "the entire case sort of rests on this term."  *See Markman* Hr'g Tr. 25:2–3, ECF No. 44.  Given these raised stakes (along with the raised burden on indefiniteness), the Court sees little harm in waiting until it has a fuller picture of this case to make them.  This means waiting until the parties have produced a complete discovery record at the summary judgment stage.

At the *Markman* hearing, Defendants argued their indefiniteness contentions should be decided now because both parties have submitted declarations from experts in support of their claim construction briefs and those experts have been deposed.  *Id.* at 24:22–23, 27:3–11.  Nevertheless, as DuraSystems noted, full expert discovery has not yet taken place.  *See id.* at 26:18–24 ("[E]xpert discovery, I think, would be very relevant as to the date of that claim because experts will give additional insight into the understanding of a person of ordinary skill in the art, and how a person of ordinary skill in the art would be applying that term to the prior art, the accused products and so forth."); *see also* Apr. 13, 2020 Text Order; Disc. Plan 2–3.  Moreover, Defendants heavily rely on extrinsic evidence in making their indefiniteness assertions, *see generally* Opening Br. 8–10, 12–13 (relying on the testimony of its expert witness), and "where extrinsic evidence of the perspective of someone skilled in the art is

13

relevant to the indefiniteness inquiry, it is appropriate to defer the indefiniteness determination until after the close of discovery." *Lifescan Scot., Ltd. v. Shasta Techs., LLC*, Case No. 11-cv-04494-WHO, 2014 WL 11206411, at *3 (N.D. Cal. Nov. 10, 2014) (citations omitted). Ultimately, "it would be more appropriate and logical to defer the full consideration of any potential indefiniteness challenge to the summary judgment stage, after all fact and expert discovery has been completed." *Uretek Holdings*, 2016 WL 3021880, at *3.

b. <u>These Claim Terms Shall Be Construed at the Summary Judgment Stage</u>

Deferring indefiniteness until summary judgment creates another issue: how to move forward when Defendants have not proposed alternative constructions for "fire rated," "specified fire rating," and "compressible insulation material." District courts have encountered this situation before and dealt with it in various ways. For example, one court, citing a lack of alternative constructions, rejected an indefiniteness argument without prejudice to it being raised again at a later stage. *Kaneka*, 2012 WL 5364699, at *5. Another court simply chose to ignore indefiniteness at the claim construction stage. *See Steuben Foods, Inc. v. Oystar Grp.*, 1:10-CV-00780-EAW-JJM, 1:10-cv-00781-EAW-JJM, 1:12-cv-00904-EAW-JJM, 1:13-cv-00892-EAW-JJM, 1:13-cv-01118-EAW-JJM, 2017 WL 3842136, at *3 (W.D.N.Y. June 6, 2017) (electing to "defer consideration of [a party's] indefiniteness argument . . . until after claim construction").

Another court made preliminary indefiniteness rulings. In *Britax Child Safety, Inc. v. Nuna International B.V.*, No. 17-cv-2724, 2019 WL 7161687 (E.D. Pa. Dec. 23, 2019), the district court identified a "conundrum": the defendants "rais[ed] an indefiniteness argument as to multiple claim terms," their argument was "premature at such an early stage of the litigation," and they did not "either (a) offer[] an alternative proposed construction for such terms or (b) mov[e] for summary judgment on invalidity grounds," *id.* at *15 (quotation marks omitted). After observing it "must first attempt to determine what a claim means before it can determine

14

whether the claim is invalid for indefiniteness, *id.* (quotation marks omitted), the district court identified a solution: "engag[ing] in claim construction analysis with respect to the terms [the defendants] allege[] are indefinite, while making only preliminary findings as to indefiniteness in light of the intrinsic record" "without prejudice to [the defendants'] ability to reassert [their] indefiniteness arguments at the close of discovery by way of a motion for summary judgment, *see id.* (citations and footnotes omitted).  *See also, e.g.*, *Cap. Sec. Sys., Inc. v. NCR Corp.*, No. 1:14-cv-1516-WSD, 2016 WL 3517595, at *4 (N.D. Ga. June 28, 2016) (embracing this approach); *Uretek Holdings*, 2016 WL 3021880, at *3 (adopting this approach).

The Court prefers to defer construction of the pertinent claim terms to summary judgment so indefiniteness and claim construction can be assessed together on a full discovery record. Indeed, these two analyses should be considered together, as despite the aforementioned material differences between them, "[i]ndefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction."  *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).  An indefiniteness analysis "involves consideration of primarily the intrinsic evidence," *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377–78 (Fed. Cir. 2015), and "[a]s in claim construction, in making an indefiniteness determination, the district court may make 'any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art . . . .'" *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, 388 F. Supp. 3d 362, 364 (D. Del. 2019) (quoting *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017)), *aff'd*, 854 F. App'x 379 (Fed. Cir. 2021).  With regard to "fire rated," "specified fire rating," and "compressible insulation material," claim construction and indefiniteness should be considered together, and since

15

indefiniteness is deferred until the summary judgment stage, it follows claim construction should

occur then as well.[6]

*   *   *

Should either party file a motion for summary judgment, the parties shall, in light of any

new evidence produced via expert discovery, address the constructions of the terms "fire rated,"

"specified fire rating," and "compressible insulation material."  Defendants can then reassert

their indefiniteness arguments.  On a motion for summary judgment, these claims shall be

construed before any indefiniteness arguments are considered.  *See ASM Am.*, 2002 WL

1892200, at *15.

In the meantime, the remaining claim terms—"thermal spacers," "thermally isolating,"

"thermal spacers thermally isolating," "exhaust duct module," "joint encasement section," and

"joined directly"—are addressed below.

### 2.        The Remaining Claim Terms

As an initial matter, it is necessary to identify those to whom the below claim terms are

addressed: POSITAs.  *See Nautilus*, 572 U.S. at 909 (noting "patents are not addressed to

lawyers, or even to the public generally, but rather to those skilled in the relevant art" (quotation

---

[6] Indeed, the preliminary indefiniteness approach employed by the *Britax Child Safety* court is not optimal.  For one thing, tentative decisions on issues as potentially dispositive as indefiniteness without the benefit of a complete discovery record could greatly elongate discovery proceedings and put certain parties in an unfounded position of strength in settlement negotiations.  Another problem with this approach is it assumes should indefiniteness be deferred until summary judgment, construction of ostensibly indefinite claim terms must occur beforehand.  But "claim construction can occur at virtually any point in the case: prior to discovery, pursuant to motions for summary judgment, or following the close of evidence at trial."  *CellCast Techs., LLC v. United States*, 152 Fed. Cl. 414, 432 n.5 (Fed. Cl. 2021) (quotation marks omitted); *cf. Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("District courts have wide latitude in how they conduct the proceedings before them, and there is nothing unique about claim construction that requires the court to proceed according to any particular protocol.  As long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best.").  While there are good reasons why claim construction should generally occur before the summary judgment phase, *see* Edward Brunet, Markman *Hearings, Summary Judgment, and Judicial Discretion*, 9 Lewis & Clark L. Rev. 93, 97 (2005) ("Cost-cutter sorts recommended a Markman hearing well in advance of trial and before expensive complex case discovery."), this does not mean some (or even all) disputed claim terms must be construed before then.

16

marks omitted)).  The parties agree a POSITA "would have a technical certification as a sheet metal worker or sheet metal mechanic, which is typically a five-year certification, or with equivalent work experience in the field of fire-rated duct systems." *See* Opening Br. 5–6 (citations omitted).  Further, he or she "may also have a bachelor's degree in mechanical engineering or [a] related field, and . . . experience could replace formal training, such that a person with five or more years of experience working in the exhaust duct field would have appropriate training to be a POS[IT]A." *Id.* at 6 (citations omitted).

a.   "thermal spacers" / "thermally isolating" / "thermal spaces thermally isolating"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "thermal spacers" | "thermal spacers thermally isolating" addressed below | "a spacer having a specific thermal isolation property" where a spacer is something that maintains two components in a spaced relationship | "thermal spacers thermally isolating" addressed below |
| "thermally isolating" | "thermal spacers thermally isolating" addressed below | "preventing the thermal transfer of heat" | "thermal spacers thermally isolating" addressed below |
| "thermal spacers thermally isolating" | "components that maintain a space between the inner duct liner and outer casing and that are configured to limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or | "thermal spacers" and "thermally isolating" addressed separately above | "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing" |

| | outer casing during fire rating testing" | | |
|---|---|---|---|

The terms "thermal spacers" and "thermally isolating" are present in claims 1, 10, and 16

(the "Independent Claims") of the '569 Patent and appear similarly in each claim.  Claim 1

provides a representative example; it claims:

> two or more exhaust duct modules; each of [which] having an inner duct liner and
> an outer casing, and a void being formed between at least a portion of space
> between said inner duct liner and said outer casing, said void being configured for
> receiving an insulation material, and including one or more thermal spacers
> configured to maintain said inner duct liner and said outer casing in a spaced
> relationship so that said insulation material occupies said void, said one or more
> thermal spacers thermally isolating said inner duct liner from said outer casing.

'569 Patent col. 8 ll. 49–59, J.A. 0015 (describing the first embodiment); *see also id.* col. 9 ll.

50–62, J.A. 0016 (describing the second embodiment); col. 10 ll. 30–43, J.A. 0016 (describing

the third embodiment).  A figure depicting a thermal spacer configuration according to an

embodiment is included below.  *See id.* col. 3 ll. 43–44, J.A. 0013.



SECTION A-A
FIG. 5b

*Id.* fig. 5(b), JA0007.[7]  As both parties heavily rely upon the prosecution history concerning

these claim terms, that should be examined as well.

The claim language regarding thermal spacers in the original draft of the '569 Patent was

notably different from the language ultimately approved by the PTO, as it did not include the

term "thermally isolating."  It reads:

> two or more exhaust duct modules; each of said exhaust duct modules having an
> inner duct liner and an outer casing, and a void being formed between at least a
> portion of space between said inner duct liner and said outer casing, said void
> being configured for receiving an insulation material, and *including one or more
> thermal spacers configured to maintain said inner duct liner and said outer
> casing in a spaced relationship* so that said insulation material occupies said void.

*E.g.*, Fire-Rated Modular Duct Assembly and Improvements Therein 14, J.A. 0037, ECF No. 32-

2 (emphasis added).

In a non-final communication rejecting the original draft on obviousness grounds,[8] the

examiner noted the relevant prior art, U.S. Patent No. 2,916,054 ("Callan"),

> teaches a modular fire-rated exhaust duct assembly comprising: two or more
> exhaust duct modules . . . each of [which] having an outer casing . . . and an inner
> flange . . . and a void . . . being formed between at least a portion of space
> between said inner flange and said outer casing, said void being configured for
> receiving an insulation material . . . *and including one or more thermal spacers . .
> . configured to maintain said inner flange and said outer casing in a spaced
> relationship* so that said insulation material occupies said void.

*E.g.*, Non-Final Rejection ¶ 4, J.A. 0257–58, ECF No. 32-3 (emphasis added).  While the term

"thermal spacers" was not the focal point of this first round of negotiations, the applicant (and

---

[7] Reference 212 points to an "external flange connector," '569 Patent col. 4 l. 24, J.A. 0013; reference 214 points to
a "flange," *id.* col. 4 l. 23, J.A. 0013; reference 320 points to an "inner connection angle member[]," *id.* col. 6 ll. 24-
25, J.A. 0014; reference 330 points to an "outer flashing member[]," *id.* col. 6 l. 20, J.A. 0014; reference 332 points
to "self-tapping screws or similar fasteners," *id.* col. 6 ll. 25–26, J.A. 0014; reference 420 points to a "thermal
spacer[]," *id.* col. 6 l. 51, J.A. 0014; and reference 600 points to "holes," *id.* col. 5, l. 13, J.A. 0014.

[8] *See* 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained . . . if the differences between the
claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before
the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed
invention pertains.").

eventual patentee), William C. Duffy,[9] amending the original draft with respect to different claim language and responding to the examiner, argued Callan does not teach thermal spacers, explaining "the sidewalls . . . according to Callan do not comprise thermal spacers as being alleged and furthermore there is no description, teaching or suggestion by Callan that the sidewalls . . . are intended to maintain an inner duct in a spaced relationship from an outer casing, as recited in claim 1 [of the amended draft '569 Patent]."  Amendment 10, J.A. 0295, ECF No. 32-3 (quotation marks omitted).

The examiner rejected the amended draft.  *See* Final Rejection ¶ 4, J.A. 0302, ECF No. 32-3.  In responding to Duffy's thermal spacers assertion, the examiner explained the spacers in the amended draft "are only there to keep duct components in a spaced relationship without requiring any specific thermal properties" and that since Callan's spacers keep an inner flange and an outer casing in a spaced relationship, Callan does indeed teach "thermal spacers."  *Id.* at 12, J.A. 0312.  In other words, the amended draft and Callan both disclosed "thermal spacers," precluding Duffy from claiming them.

Duffy then amended the claim language concerning thermal spacers and responded to the examiner's explanation.  First, he amended the rejected language by adding the language in the '569 Patent, which, as indicated above, includes the term "thermally isolating."  Request for Continued Examination and Amendment 3, J.A. 0322, ECF No. 32-3.  Second, he provided context for his amendment, explaining "[t]he thermal isolation function of the thermal spacers . . . is entirely consistent with" the function fire-rated duct systems serve in commercial kitchens as recited in the background section of the '569 Patent.  *See id.* at 10, J.A. 0329; *see also* '569 Patent col. 1 ll. 47–50, J.A. 0012 ("[A]ny potential fire inside the duct system must be contained

---

[9] Duffy founded DuraSystems, which owns the '569 Patent by assignment.  Am. Compl. ¶¶ 9, 34.

and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building.").

He also stated "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating." Request for Continued Examination and Amendment 9, J.A. 0328. In addition, he noted "[a]ccording to one aspect, the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat . . . from the inner duct to the outer casing." *Id.* at 10, J.A. 0329. After rehashing his argument regarding Callan's sidewalls, he concluded "even if the sidewalls are construed as thermal spacers, which is not herein being conceded, Callan fails to describe and teach 'one or more thermal spacers thermally isolating said inner duct liner from said outer casing' as . . . amended and currently presented." *See id.* at 11, J.A. 0330 (quotation marks omitted).

The examiner then granted Duffy's application. Not. of Allowability 1, J.A. 0341, ECF No. 32-3. In his statement of reasons for the allowance, the examiner stated "the primary reason for allowance is the inclusion of limitations 'said one or more thermal spacers thermally isolating said inner duct liner from said outer casing' in claims 1, 10, and 16." *Id.* at 2, J.A. 0342. Further, he noted while Callan "teaches an insulated section, an inner duct liner, a first and second flange connector and a joint encasement section," it "does not teach an outer casing and thermal spacers which thermally isolate the inner duct liner from said outer casing." *Id.*

   *i.*  *"thermal spacers"*

Two issues concern the construction of "thermal spacers," one the parties vigorously address and the other they all but ignore: (1) whether thermal spacers require a spacer to have a specific thermal isolation property and (2) whether thermal spacers by themselves thermally

isolate.  For the reasons stated below, (1) thermal spacers must themselves thermally isolate, but (2) thermal spacers need not have a specific thermal isolation property.

<u>Thermal Spacers Must Thermally Isolate</u>

The intrinsic evidence shows thermal spacers themselves thermally isolate.  While DuraSystems argues a POSITA would understand "the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat," Pl.'s Br. 17 (emphasis omitted) (quoting Request for Continued Examination and Amendment 10, J.A. 0329), the Independent Claims make clear the "thermal spacers thermally isolate[e]."  *See, e.g.*, '569 Patent col. 8 ll. 58–59, J.A. 0015.  While the word "configured" is used six times in each of the Independent Claims, *e.g.*, *id.* col. 10 ll. 27–56, J.A. 0016, it is never used to indicate the "thermal spacers" do not, on their own, thermally isolate the inner duct liner from the outer casing.

This idea is supported by the prosecution history.  First, despite Duffy arguing the arrangement of the inner duct liner, outer casing, insulation material, and thermal spacers is configured to prevent heat transfer, he nevertheless indicated "thermal spacers" have a "thermal isolation function."  *See* Request for Continued Examination and Amendment 10, J.A. 0329. Second, and more importantly, by amending the draft independent claims to include the limitation "thermally isolating" in an attempt to overcome Callan, *see id.* at 11, J.A. 0330, he restricted the meaning of "thermal spacers" to spacers that thermally isolate the inner duct liner from the outer casing.  *Cf. Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("A patentee could [limit the meaning of a claim term] by clearly characterizing the invention in a way to try to overcome rejections based on prior art." (citations omitted)); *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) ("[A]n

amendment that clearly narrows the scope of a claim, such as by the addition of a new claim

limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate

the limitation or that would otherwise recapture the claim's original scope.").

<u>Thermal Spacers Need Not Have a Specific Thermal Isolation Property</u>

Just because thermal spacers thermally isolate does not mean they must have a specific

thermal isolation property.  Defendants first argue the Independent Claims "make[] clear that

'thermal spacers' are spacers that have a specific thermal isolation property."  Opening Br. 14

(emphasis and citation omitted).  But it is far from clear these claims—which make no mention

of thermal isolation properties, let alone any particular one—mean what Defendants say.  They

provide little support for this proposition; their primary citation is to the background section of a

Federal Circuit case, *see Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1372 (Fed. Cir.

2004) (citation omitted), the relevance of which they fail to explain.  This argument is so lightly

addressed, DuraSystems declined to respond to it.

Heavier, though, is the focus on the prosecution history.  Defendants contend Duffy

"defined 'thermal spacer' to be a spacer with a specific property" by "disclaim[ing] . . . any

spacer that does not have a specific thermal isolation property and that does not prevent the

transfer of heat" in prosecuting the '569 Patent.  Opening Br. 16 (citations omitted).  They rely

on Duffy stating "[t]he term 'thermal' in the context of the subject application means and refers

to 'specific thermal properties[,'] namely, thermally isolating" and "the thermal spacers is [sic]

configured to prevent the thermal transfer of heat."  *Id.* at 15–16 (citation and emphases omitted).

For its part, DuraSystems points out Duffy never limited thermal spacers to one thermal

property, as it explicitly referred to "multiple thermal properties."  *See* Pl.'s Br. 15 (quotation

marks, citation, and emphasis omitted) ("Defendants misconstrue this statement that clearly

includes multiple thermal 'properties' to be a definition and/or disavowal limiting 'thermal spacers' to one thermal property . . . .").

There are two exceptions to the rule claim terms are given their ordinary meaning: (1) "when a patentee sets out a definition and acts as his own lexicographer" and (2) "when [a] patentee disavows the full scope of a claim term either in the specification or during prosecution." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014). The doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citations omitted). When a patentee has disavowed a particular meaning to obtain a patent, prosecution disclaimer applies and "narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324. This doctrine "plays an important role in the patent system," as "[i]t 'promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.'" *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (quoting *Omega*, 334 F.3d at 1324)). "Such disclaimer can occur through amendment or argument." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (citation omitted).

But "for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016) (quotation marks and alteration omitted). "Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations," prosecution disclaimer does not apply. *Id.* (quotation marks omitted); *see also Omega*, 334 F.3d at 1325 ("[W]e have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim

24

scope."). A party seeking to invoke this doctrine "bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art." *Shire Pharms.*, 839 F.3d at 1119 (quotation marks omitted). This is a heavy burden. *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[T]he standard for disavowal is exacting . . . ."); *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

While "[a] disavowal must be clear, . . . it need not be explicit." *Techtronic Indus. Co. v. Int'l Trade Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) (citation omitted). Indeed, patent applicants "rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following'" and "need not do so to meet the applicable standard." *Saffran v. Johnson & Johnson,* 712 F.3d 549, 559 (Fed. Cir. 2013). "Disavowal may be inferred from clear limiting descriptions of the invention in the . . . prosecution history." *Techtronic*, 944 F.3d at 907 (quotation marks and citation omitted). Further "[a]n inventor may also disavow claim scope by distinguishing the claimed invention over the prior art." *Id.* (quotation marks and citation omitted). And "an amendment that clearly narrows the scope of a claim, such as by the addition of a new claim limitation, constitutes a disclaimer of any claim interpretation that would effectively eliminate the limitation or that would otherwise recapture the claim's original scope." *Schindler*, 593 F.3d at 1285.

Defendants fail to show DuraSystems disclaimed any spacer that does not have a specific thermal isolation property. While Defendants rely on Duffy explaining "[t]he term 'thermal' in the context of the subject application means and refers to 'specific thermal properties[,'] namely, thermally isolating," Request for Continued Examination and Amendment 9, J.A. 0328, "a clear

disclaimer of any spacer that does not have a specific thermal isolation property" this is not, *see* Opening Br. 16 (citations omitted).  On one side of the coin, it is doubtful Duffy was referring to one particular property when indicating "thermal" refers to "specific thermal propert*ies*."  But on the other, when referring to "specific thermal properties," Duffy did not refer to multiple properties—just "thermally isolating."  Though one could argue "thermally isolating" is the property Defendants are looking for, whether "thermally isolating" is a property is not entirely clear either.  As Defendants assert, "a property is a material trait," Reply Br. 8; *cf. id.* ("'[H]eat transfer' is not a thermal property of a material." (citing Dep. of Tony Crimi ("Crimi Dep.") 181:7–187:13, 245:8–14, Reply Br. Ex. 1, ECF No. 41-1), and material traits "are ones such as thermal conductivity, thermal capacity, etc. that *result* in 'thermal isolation,'" *id.* (emphasis added).  By this argument, thermal isolation[10] is not a property, but a result—or, as Duffy would put it, a "function."  *See* Request for Continued Examination and Amendment 10, J.A. 0329 (discussing "[t]he thermal isolation function of the thermal spacers").

From this fuzziness comes a clear conclusion: Duffy's prosecution statement is "too vague or ambiguous to qualify as a disavowal of claim scope."  *See Omega*, 334 F.3d at 1325. Accordingly, the term "thermal spacers" cannot be construed as spacers that possess a specific thermal isolation property and "thermal spacers" are therefore spacers that thermally isolate.

That "thermal spacers" cannot be construed this way is further supported by the examiner's rejection of the drafts of the '569 Patent.  "Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).  The examiner noted Callan, which "teaches a modular

---

[10] Whether "thermal isolation" and "thermally isolating" can or should be addressed in the same discussion is also unclear.

fire-rated exhaust duct assembly . . . including one or more thermal spacers . . . configured to maintain said inner flange and said outer casing in a spaced relationship, *e.g.*, Non-Final Rejection ¶ 4, J.A. 0257–58, "teach[es] thermal spacers," Final Rejection 12, J.A. 0312, even though it does not require thermal spacers to have any specific thermal properties.  In rejecting the amended draft, the examiner concluded it could not overcome Callan because its spacers were "only there to keep duct components in a spaced relationship without requiring any specific thermal properties."  *Id.*  "Thermal spacers," devoid of any accompanying language (such as "thermally isolating") therefore only refer to spacers *without* specific thermal properties.  Indeed, only after the amended draft was amended to pair "thermally isolating" with "thermal spacers" did the examiner determine it distinguished Callan.[11]

>        ii.        *"thermally isolating"*

Chiefly at issue here is the extent to which "thermal spacers" must "thermally isolate." DuraSystems argues they must limit heat transfer and Defendants contend they must prevent it. *See* Joint Claim Construction Chart 2–3.  A construction favoring DuraSystems would trigger another issue: whether limiting heat transfer means "limit[ing] the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  *See id.*

The four corners of the '569 Patent provide little guidance; the claims do not explain what "isolating" means and the specification does not either.  While DuraSystems asserts language in the background section shows "isolating" means "minimizing," *see* Pl.'s Br. 18

---

[11] To be sure, the examiner ultimately granted Duffy's application, explaining "the primary reason for allowance is the inclusion of limitations 'said one or more thermal spacers thermally isolating said inner duct liner from said outer casing' in claims 1, 10, and 16."  Not. of Allowability 2, J.A. 0342.  But his explanation did not contain any reference to any specific thermal properties, and even if it did, unilateral statements by an examiner do not give rise to a "clear disavowal of claim scope by an applicant."  *See Salazar*, 414 F.3d at 1347.

(emphasis and quotation marks omitted), that language refers to the capabilities of the entire fire-rated exhaust duct system, not the thermal spacers—which as explained above, must *themselves* thermally isolate.  *See supra* section I.B.2.a.i.  Indeed, that "a fire-rated duct must be capable of minimizing the transfer of heat," '569 Patent col. 1 ll. 34–36, J.A. 0012, only speaks to a fire-rated duct.  Although DuraSystems contends other language shows "isolating" means "limit[ing]," *see* Pl.'s Br. 18 (emphasis and quotation marks omitted), that language doesn't even indicate what part of an exhaust duct module does the limiting.  *See* '569 Patent col. 1 ll. 47–50, J.A. 0012 ("[A]ny potential fire inside the duct system must be contained and thermal transfer through the duct walls limited to prevent ignition of adjacent combustible material in the kitchen or other areas of the building.").

Perhaps for this reason, the parties primarily focus on the prosecution history.  Defendants argue Duffy's statement that "the arrangement of the inner duct liner, the outer casing, the insulation material in the void and the thermal spacers is configured to prevent the thermal transfer of heat . . . from the inner duct to the outer casing," Request for Continued Examination and Amendment 10, J.A. 0329, "form[s] the basis for [their] construction," Opening Br. 19 (citation omitted).  DuraSystems contends Duffy was referring to the arrangement of multiple parts of the exhaust duct system, rather than just the thermal spacers, *see* Pl.'s Br. 17 (citation omitted), and argues a POSITA would understand "'prevent the thermal transfer of heat' to be a colloquial, rather than a literal, use of 'prevent,'" *id.* (citing Decl. of Tony Crimi ("Crimi Decl.") ¶ 50, Pl.'s Br. Ex. AA, ECF No. 36-1), reasoning preventing the thermal transfer of heat is a "physical impossibility" and a construction of "isolating" as "preventing" would therefore exclude every embodiment in the '569 Patent, *see id.* (citation omitted).

This statement does not directly address "thermal spacers."  Indeed, it means an exhaust duct system as a whole "prevent[s] the thermal transfer of heat," *see* Request for Continued Examination and Amendment 10, J.A. 0329—and not "thermal spacers," which themselves must thermally isolate, *supra, e.g.*, section I.B.2.a.i.  But when read in the context of the '569 Patent, it demonstrates "isolating" is best understood as "limiting."

First, the word "prevent" should be read restrictively.  While DuraSystems's expert testified it is not possible to truly prevent the transfer of heat, *see* Crimi Dep. 185:22–186:8, and declared a POSITA would understand Duffy used the word "prevent" colloquially, *see* Crimi Decl. ¶ 50, he nevertheless testified "preventing" means "stopping," as opposed to "limiting," *see* Crimi Dep. 189:9–12.  And as he acknowledged it is possible to "effectively" prevent the thermal transfer of heat, *id.* at 186:11–14, DuraSystems's concern about excluding every embodiment in the '569 Patent, *see* Pl.'s Br. 17 (citation omitted), (even if Duffy's statement were about "thermal spacers") is unfounded.  "Prevent" is therefore akin to "effectively stop."

Second, given this necessarily restrictive reading, construing "isolating" as "preventing" would be improper.  If an exhaust duct system "prevents the thermal transfer of heat," finding thermal spacers must do so as well renders the term "thermally isolating" superfluous—a result the Federal Circuit would not countenance.  *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." (citation omitted)).  Indeed, there would be no need for thermal spacers to prevent the thermal transfer of heat if an exhaust duct system already does the same thing.

Third, because thermal spacers still have a "thermal isolation function," *see* Request for Continued Examination and Amendment 10, J.A. 0329, the definition of "isolating" must take a

middle ground between "preventing" (i.e., "effectively stopping") the thermal transfer of heat and doing nothing.  Indeed, "thermal spacers" must still thermally isolate.  The word "limiting," which Defendants acknowledge is broader than "preventing," *cf.* Opening Br. 19 (arguing against "broaden[ing] [the definition of] 'isolation' to mean 'limitation'" (citations omitted)), fits the bill.

Defendants, citing a dictionary, argue "the plain and ordinary meaning of isolate . . . is 'to set apart or cut off from a group or whole' or 'to place in quarantine,'" *id.* at 18 (quoting *The American Heritage Dictionary* 453 (4th ed. 2000), Opening Br. Ex. S, ECF No. 31-20), and accordingly, "the plain and ordinary meaning of 'thermally isolate' would then be to keep heat in one component from getting to the other," *id.* (footnote omitted).  While the Court can rely upon dictionary definitions in construing claim terms, *see Cont'l Circuits*, 915 F.3d at 799, it can only do so if they "do[] not contradict the meaning otherwise apparent from the intrinsic record," *see Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1321 ("[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract.").  Because the definition proffered by Defendants contradicts the meaning of "isolating" based on the intrinsic record, it is not considered.  *See Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1222 (Fed. Cir. 2020) (finding "the intrinsic record trumps" after observing "the meaning of [a claim term] as discerned from the intrinsic evidence squarely conflicts with the meaning that [the plaintiff] would distill from its selected extrinsic evidence" (citation omitted)).  Moreover, Defendants' definition does not even mention the word "prevent," the linchpin of their proposed construction.  Even if the definition did not contradict the meaning suggested by the intrinsic evidence, it is accordingly overbroad.  *See Luv N' Care, Ltd. v.*

*Laurain*, CIVIL ACTION NO. 3:16-cv-00777, 2018 WL 3213149, at *6 (W.D. La. June 29, 2018) ("This Court does not rely on the dictionary definitions submitted by the LNC Parties as they are extrinsic evidence, are overly broad, and are contradicted by the intrinsic record.").

Finally, since "isolating" means "limiting," it is necessary to determine whether the rest of DuraSystems's proposed construction should be accepted.  In other words, the Court must determine whether limiting heat transfer means "limit[ing] the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  *See* Joint Claim Construction Chart 2–3.

Both parties ground their arguments in indefiniteness concerns.  Defendants argue DuraSystems's proposed construction "would be indefinite because there is no standard for how much heat the spacers need to 'limit' in order to avoid 'failure points,'" *see, e.g.*, Opening Br. 17 (citing Decl. of Barry M. Cheek ¶¶ 77–78, Opening Br. Ex. B, ECF No. 31-3) (other citation omitted), and thereby ties its position back to its indefiniteness contentions regarding the terms "fire rated" and "specified fire rating," *see* Reply Br. 9 ("[L]inking the meaning of the term 'thermally isolating' to a fire rating test makes the definition [of the term 'thermally isolating'] indefinite . . . ." (internal cross reference omitted)).  DuraSystems reasons a POSITA must know "to what degree the thermal spacer must 'limit' or 'minimize' the thermal transfer of heat to be a 'thermal spacer thermally isolating'" and references Defendants' indefiniteness argument concerning the term "compressible insulation material."  Pl.'s Br. 18.  Just as Defendants rely upon extrinsic evidence to support their indefiniteness position, DuraSystems relies upon extrinsic evidence to support its proposed construction.  *See id.* at 18–19.

As explained above, *supra* section I.B.1.a., indefiniteness arguments are best addressed on a motion for summary judgment.  Accordingly, the indefiniteness contentions regarding

"thermally isolating," like those regarding "fire rated," "specified fire rating," and "compressible insulation material," are deferred until the summary judgment stage.  Whether DuraSystems's proposed construction is proper is tied to this indefiniteness dispute and will not be decided now.

In fact, it is even more justified to defer consideration of these indefiniteness contentions. Here, Defendants do not argue "thermally isolating" is facially indefinite and cannot be construed; rather, they say "thermally isolating" is indefinite if the Court adopts DuraSystems's proposed construction thereof.  In other words, they raise an "as-applied" indefiniteness challenge—one which is especially well-suited to resolution at the summary judgment stage. *See, e.g.*, *3-D Matrix*, 2016 WL 111410, at *13 ("[C]ourts have recognized that there are reasons to defer ruling on indefiniteness until the summary judgment stage.  This is especially so if the claim language itself is amenable to construction but is alleged to be indefinite as applied." (quotation marks and citations omitted)).  Indeed, the parties' "battle of the experts" is precisely the kind of dispute that should not be decided at the claim construction stage.  *See Steuben Foods*, 2017 WL 3842136, at *2 (citations omitted).

*   *   *

Most of the disputes regarding "thermal spacers" and "thermally isolating" having now been resolved, the Court turns to the first issue the parties present thereon: whether "thermal spacers" and "thermally isolating" should be construed separately or together.  Defendants argue they should be construed separately because "the latter is the function the thermal spacers performs [sic], not what the thermal spacers are."  *See* Opening Br. 13 n.5; *cf.* Reply Br. 7 ("Plaintiff is desperate to have the Court not say what a 'thermal spacer' is . . . ." (emphasis omitted)).  DuraSystems contends they should be construed together because they "appear in the

claims as 'thermal spacers thermally isolating,'[12] [and] it makes more sense to construe the phrase as a whole."  Pl.'s Br. 12–13 n.6.

While the Court analyzed these terms separately, it construes them together, given they largely appear together in the Independent Claims, their separate constructions are primarily based on the same aspects of the '569 Patent's prosecution history, and each construction influences the other.

Accordingly, "thermal spacers thermally isolating" is construed as "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing."  The language subject to the aforementioned as-applied indefiniteness challenge is tentative; whether it shall remain so shall be decided, like the indefiniteness arguments, at the summary judgment stage.

b.   "exhaust duct module"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
| --- | --- | --- | --- |
| "exhaust duct module[s]" | "a section of pre-fabricated, factory-built exhaust duct" | "a section of an exhaust duct" | "a section of pre-fabricated, factory-built exhaust duct" |

The term "exhaust duct module" appears in claims 1, 3, 7, and 9–20.  As Defendants acknowledge, the parties agree "a 'module' is a 'section' of an overall exhaust duct."  *See* Opening Br. 20.  They dispute whether an "exhaust duct module" is a "pre-fabricated, factory-built" duct.  *See* Joint Claim Construction Chart 3.

---

[12] While the terms "thermal spacers" and "thermally isolating" do often appear together, *e.g.*, '569 Patent col. 8 ll. 58–59, J.A. 0015, the term "thermal spacers" sometimes appears on its own, *e.g.*, *id.* col. 8 l. 55, J.A. 0015.

The claims do not provide an answer, and the parties focus their attention on the specification.  Defendants, arguing an "exhaust duct module" is not necessarily "pre-fabricated, factory built," contend DuraSystems's construction impermissibly reads into the claims a preferred embodiment.  Opening Br. 20.  DuraSystems contends the '569 Patent describes the invention as an exhaust duct system "configured to be assembled in the field," *see* Pl.'s Br. 20 (quotation marks omitted), and a POSITA would understand a system configured this way "is a pre-fabricated or factory-built exhaust duct," *id.* (citing Crimi Decl. ¶ 65).  Both parties understand a "pre-fabricated duct" is a "factory-built" duct.  *See* Pl.'s Br. 20 (positing "those in the relevant industry distinguish between 'field-fabricated' versus 'pre-fabricated' / 'factory-built' fire-rated exhaust ducts"); Reply Br. 13 (referring to "an exhaust duct that is pre-fabricated and factory-built"); *cf.* '569 Patent col. 7 ll. 24–29, J.A. 0015 ("The insulation material . . . is affixed to the inner face or side of the outer metallic layer . . . using suitable adhesives and/or mechanical fasteners, in order to provide for pre-fabrication at the factory and thereby minimize the number of components transported to and assembled on site.").

"[P]atents disclose 'embodiments' and 'preferred embodiments' of the claimed invention, the purposes of which are 'to provide a disclosure to the public of [the inventor's] best mode of carrying out the invention when the applications were filed."  *Edelbrock, LLC v. Whipple Indus., Inc.*, Case No. 1:19-cv-01502-DAD-EPG, 2021 WL 321643, at *3 (E.D. Cal. Feb. 1, 2021) (alteration in original) (quoting *Constr. Tech., Inc. v. Cybermation, Inc.*, 965 F. Supp. 416, 431 (S.D.N.Y. 1997)).  "Such a disclosure is included for the benefit of the public, rather than to limit the scope of the invention."  *Id.* (citing *Constr. Tech., Inc.*, 965 F. Supp. at 431) (other citation omitted).  Accordingly, a patent's "*claims*, not specification embodiments, define the scope of patent protection," *see Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009)

(emphasis added), and "although the specification[] may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments," *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (quotation marks and alteration omitted). As the Federal Circuit has often explained, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *See, e.g.*, *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (quotation marks and alteration omitted). Stated differently, for the specification to disavow claim scope, it "must contain expressions of manifest exclusion or restriction." *See Cont'l Circuits*, 915 F.3d at 797 (quotation marks omitted).

But a specification disavowal, like a prosecution history disavowal, "need not be explicit." *Poly-Am.*, 839 F.3d at 1136 (citation omitted); *see Rembrandt Patent Innovations, LLC v. Apple, Inc.*, 716 F. App'x 965, 972 (Fed. Cir. 2017) ("[D]isclaimer does not require express statements by the patentee identifying the surrendered claim scope. Rather, it may be implicit, so long as it is sufficiently clear." (citing *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015)). Two types of implicit specification disavowal are relevant here. First, "an inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." *See Poly-Am.*, 839 F.3d at 1136 (citation omitted). In other words, "[w]hen a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon*, 503 F.3d at 1308; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only

35

preferred embodiments, [can] . . . support a limiting definition of a claim term." (citation

omitted)).  Such statements "are more likely to be found in certain sections of the specification,

such as the Summary of the Invention," *C.R. Bard*, 388 F.3d at 864 (citation omitted), as well as

the abstract, *see, e.g.*, *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed.

Cir. 2012), the background, *see, e.g.*, *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321

(Fed. Cir. 2011), and even the title, *see, e.g.*, *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d

816, 823 (Fed. Cir. 2016).  Second, "an inventor may disavow claims lacking a particular feature

when the specification distinguishes or disparages prior art based on the absence of that feature."

*Poly-Am.*, 839 F.3d at 1136 (citations omitted); *see also Astrazeneca AB v. Mut. Pharm. Co.*, 384

F.3d 1333, 1340 (Fed. Cir. 2004) ("Where the general summary or description of the invention

describes a feature of the invention . . . and criticizes other products . . . that lack that same

feature, this operates as a clear disavowal of these other products . . . ." (citation omitted)).

"[I]n either case, an implied disavowal must be clear and may be undermined by other

intrinsic evidence from the patent's specification."  *Kranos IP Corp. v. Riddell, Inc.*, 339 F.

Supp. 3d 850, 853 (N.D. Ill. 2018).  Indeed, "[t]he standard for disavowal of claim scope is . . .

exacting. . . . [and] [t]o find disavowal, [the Court] must find that the specification is both so

clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous

evidence of disclaimer."  *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015)

(quotation marks omitted).  Ultimately, whether the specification disavows the scope of a claim

must be determined in light of the specification as a whole.  *See id.* at 514–16 (finding a patent's

specification disavowed the scope of a claim after reviewing the specification's "Background of

the Invention," "Summary of the Invention," and "Detailed Description" sections).

DuraSystems satisfies this heavy burden.  First, it points to the first sentence of the '569 Patent's "Brief Summary of the Invention."  *See* Pl.'s Br. 21 (quotation marks omitted).  This sentence provides "[t]he present invention comprises embodiments of a modular fire-rated duct system and improvements therein and *suitable for pre-fabrication and configured for assembly in the field*," '569 Patent col. 2 ll. 22–25, J.A. 0012 (emphasis added), and thereby makes clear "pre-fabrication" is a "characteristic feature" of the invention as a whole, *see Poly-Am.*, 839 F.3d at 1136–37 (determining one sentence in the specification of the patent at issue "describe[d] a characteristic feature of the invention" and found, based in part on this sentence, that the patent "clearly and unequivocally disavow[ed] claims" lacking that feature).  Indeed, by indicating the invention is "suitable for pre-fabrication," it describes "pre-fabrication" as a feature thereof.  *See Astrazeneca*, 384 F.3d at 1340 (holding the specification disavowed "nonsurfactant solubilizers" in part because the specification "twice describe[d] micelle structures as a feature of the [invention]" by stating "[t]his form of controlled release mechanism is a suitable way to control the release of the micelles of drug and solubilizer" and it was "undisputed that surfactants are the only solubilizers believed to form micelle structures in [the relevant environment]" (quotation marks and citations omitted)).  This sentence, which prefaces three paragraphs separately describing embodiments of the invention, is precisely the kind of "summation sentence" that can effectuate an implicit disavowal.  *See GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016) (finding a single sentence in the specification could limit claim language because it was "a summation sentence which describe[d] the invention as a whole" (emphasis and quotation marks omitted)).

Second, DuraSystems claims the "Background of the Invention" disparages fire-rated ducts that are not pre-fabricated and compares them to pre-fabricated ducts in a way that

"confirm[s] to a P[]OSITA that the '569 patent distinguishes between field-applied and pre-fabricated or factory-built fire-rated exhaust ducts."  Pl.'s Br. 20–21 (citations omitted).  In relevant part, the Background of the Invention provides:

> Known fire-rated exhaust duct systems are typically fabricated in sections, and the sections are shipped to the installation location.  At the installation location, the sections are welded together to form continuous conduits or conduit sections.  Due to field conditions, the welding could be of poor work quality, for instance, due to limited space and/or setup.  This means expensive rework and re-welding to seal leaks in the duct system during pressure testing.  Conventional fire-rated duct systems typically require the installation of an additional gypsum fire-rated enclosure (approximately 10" thick) around the duct.  In addition to requiring an additional step, the gypsum enclosure is typically constructed/installed by another trade.

'569 Patent col. 1 ll. 61–67, col. 2 ll. 1–6, J.A. 0012.  It then explains:

> In an attempt to overcome the known shortcomings in the art, chimney manufacturers introduced pre-fabricated fire-rated exhaust ducts based on a modification of existing chimney exhaust systems.  While these pre-fabricated fire-rated exhaust ducts addressed shortcomings of existing systems, the characteristic round profile significantly limits the volume of air that can be vertically carried in conventional building footprints, and in a horizontal configuration, the round profile or cross section is often too large to fit into conventional ceiling spaces or dimensions.

Id. col. 2 ll. 7–16, J.A. 0012.

These passages disavow ducts that are not pre-fabricated.  As DuraSystems notes, the first passage explains and discusses the disadvantages of fire-rated exhaust ducts that have to be augmented with "gypsum fire-rated enclosure[s]" at "the installation location"—which a POSITA would understand to be "field-applied."  See id. col. 1 ll. 61–67, col. 2 ll. 1–6, J.A. 0012; Pl.'s Br. 20–21 (citing Crimi Decl. ¶¶ 61–62).  The second passage then, after referencing "the known shortcomings in the art," introduces "pre-fabricated fire-rated exhaust ducts."  Id. col. 2 ll. 7–9, J.A. 0012.  While it describes another shortcoming with these ducts, the issue is not that they are "pre-fabricated" or otherwise cumbersome to put together but that they are round.

*Id.* col. 2 ll. 10–14, J.A. 0012.[13]   While the "Detailed Description of the Embodiments"
contemplates "applications . . . [in which] the insulating material . . . and the outer metallic
profile . . . be kept as separate components and then *field installed* over [the] joint between the
exhaust duct sections," '569 Patent col. 7 ll. 30–34, J.A. 0015 (emphasis added), such
applications are only contemplated "where size and weight limitations and/or characteristics"
require them, *id.*, "thus even further disparaging" ducts that are not pre-fabricated, *see
UltimatePointer*, 816 F.3d at 823 ("Although the [patent at issue] does include one embodiment
where the handheld device 'may include a conventional, indirect pointing device,' indirect
pointing is only used 'where direct pointing is not possible or not desired,' thus even further
disparaging indirect pointing." (citation omitted)).   Ultimately, by distinguishing between "field
applied" and "pre-fabricated" ducts, the Background of the Invention disavows the former and
thereby limits the scope of the claims to the latter.   *See Poly-Am.*, 839 F.3d at 1136 (finding the
inventor of a patent for certain trash bags "disavow[ed] claims lacking a particular feature" by
stating in the specification that prior art trash bags "are difficult to secure over trash receptacle
lips").

     To be sure, some Federal Circuit decisions arguably held statements characterizing an
invention as a whole can only disavow subject matter if they are made "repeatedly and
consistently."   *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1346–48 (Fed. Cir.
2004) (holding a claim term was properly construed in accordance with a limitation that was
"repeatedly and consistently" indicated in the specification by statements that "broadly

---

[13] Not surprisingly, the invention addresses this shortcoming.  *See, e.g.*, '569 Patent col. 9 ll. 14–16, J.A. 0016
(claiming "[t]he modular fire-rated exhaust duct assembly as claimed in claim 1, wherein said exhaust duct modules
have a generally rectangular cross-section"); *id.* col. 9 ll. 47–51, J.A. 0016 (claiming "[a]n exhaust duct module
configured to be assembled in the field to form a fire-rated exhaust duct assembly, said exhaust duct module
comprising: an inner duct liner formed with a generally rectangular cross-section").

describe[d] the overall inventions of [the] patent[]"); *Sunovion Pharms., Inc. v. Teva Pharms., Inc.*, 731 F.3d 1271, 1277 (Fed Cir. 2013) ("The applicants' repeated and consistent attribution of the purity level of less than 0.25% levorotatory isomer to 'the invention' and 'the instant invention' thus gives meaning to the term 'essentially free.'" (citing *Microsoft*, 357 F.3d at 1348) (other citation omitted)); *see also Thermal Sols., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-2220-JWL, 2009 WL 3126227, at *4 (D. Kan. Sept. 29, 2009) (referring to the "*Microsoft* standard . . . which allows the claim scope to be limited if the patent 'repeatedly and consistently' describes the scope of the invention (and not a mere embodiment) as limited").[14]  And the Federal Circuit has also said "[t]o find disavowal of claim scope through disparagement of a particular feature, we ask whether 'the specification goes well beyond expressing the patentee's preference . . . [such that] its repeated derogatory statements . . . may be viewed as a disavowal.'"  *Openwave Sys., Inc.*, 808 F.3d at 513 (quoting *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1372 (Fed. Cir. 2012)) (citing *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1269–70 (Fed. Cir. 2007)).

As mentioned above, the specification only contains one statement describing the invention as a whole.  Whether it "repeatedly" disparages the prior art is not clear.  But it is also not clear whether the aforementioned caselaw signals it is necessary or sufficient for statements describing an entire invention or disparaging the prior art to be repeated.  More importantly,

---

[14] In addition, the Federal Circuit in *GPNE*, before finding a single summation sentence can limit claim language if it describes an invention as a whole, 830 F.3d at 1371, recognized "when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization," *id.* at 1370 (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374–75 (Fed. Cir. 2009)), and noted limiting words in the patent at issue were employed in the specification over 200 times, *id.*  While the court did not indicate those words addressed the invention as a whole, one of the cases it cited, *VirnetX*, speaks to words that do.  *See VirnetX*, 767 F.3d at 1318 ("The fact that anonymity is 'repeatedly and consistently' used to characterize the invention strongly suggests that it should be read as part of the claim." (citation omitted)).

numerous other Federal Circuit decisions indicate both of these types of implicit disavowal are considered together when determining whether a specification disavows subject matter.  *See UltimatePointer*, 816 F.3d at 823 ("Taken together, the repeated description of the invention as a direct-pointing system, the repeated extolling of the virtues of direct pointing, and the repeated criticism of indirect pointing clearly point to the conclusion that the "handheld device" in claims 1, 3, 5, 6, and 12 is limited to a direct-pointing device."); *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 933 (Fed. Cir. 2019) (affirming the district court's construction of a claim term after observing the specification, among other things, "describe[d] the features of the present invention as a whole" and "explained the benefits [thereof] over the prior art" (quotation marks and citation omitted)).[15]  Considering these two forms of implicit disavowal together makes sense, as whether a specification can disavow claim scope is determined with reference to the entire specification, not just to certain sections.  *Cf., e.g.*, *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[T]his court looks to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification *read as a whole* suggests that the very character of the invention requires the limitation be a part of every embodiment." (emphasis added)).  And it would make no sense to ignore demonstrable evidence of disavowal simply because two statements may be off in slightly different doctrinal silos.  Implicit disavowal by a statement describing an entire invention and by one disparaging

---

[15] On at least one occasion, the Federal Circuit even blended these types of implicit disavowal together.  In *Eon-Net LP*, the Federal Circuit affirmed the district court's decision to limit the claim terms "document," "file," "extract," and "template" to "information that originates from a hard copy document," 653 F.3d at 1321.  In doing so, it noted the specification of the relevant patent "repeatedly and consistently define[d] the invention as a system that processes information from hard copy documents."  *Id.*  However, in supporting this proposition, it cited (among other things) language that, instead of describing the entire invention, disparaged the prior art.  *See id.* ("The written description repeatedly and consistently defines the invention as a system that processes information derived from hard copy documents. The Background of the Invention section explains that 'conventional systems have limitations which decrease the efficiency of processing information from a hard copy document.'" (citation omitted)).

the prior art are two sides of the same coin: two concepts that help courts answer the ultimate question of whether a specification disavows claim scope.  Here, based on the summation sentence and the passages disparaging the prior art mentioned above, the '569 Patent's specification limits the reach of "exhaust duct modules" to those that are "pre-fabricated" in accordance with DuraSystems's proposed (and herein adopted) construction.

Defendants also argue "claim 1 explicitly requires 'field assembly' when other independent claims do not, creating a presumption that the 'exhaust duct module' in all the independent claims cannot be as limited."  Reply Br. 13 (citation omitted).  In other words, they, assuming *arguendo* "field assembled" means "pre-fabricated," *see id.*,[16] contend because claim 1 refers to "field assembly" and the rest of the Independent Claims do not, "field assembly"—and by extension, "pre-fabrication"—can only relate to that claim and therefore only describes one embodiment in the '569 Patent, and not the invention itself.

This argument implicates the doctrine of claim differentiation:

The doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.  Although the doctrine is at its strongest where the limitation sought to be "read into" an independent claim already appears in a dependent claim, there is still a presumption that two independent claims have different scope when different words or phrases are used in those claims.

*Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368–69 (Fed. Cir. 2005) (quotation marks and citations omitted).  "However, claim differentiation is a rebuttable presumption that may be

---

[16] "Field assembled" (as opposed to "field applied," *see* Crimi Decl. ¶¶ 56–57, 65) does mean "pre-fabricated."  This is demonstrated by the testimony of DuraSystems's expert, who explained "[a] P[]OSITA would understand . . . a fire-rated exhaust duct 'suitable for pre-fabrication' that is 'configured for assembly in the field' to refer to a pre-fabricated or factory-built fire-rated exhaust duct because that is precisely what a pre-fabricated or factory-built fire-rated exhaust duct is."  *Id.* ¶ 64; *see generally id.* ¶¶ 61–65.  Defendants do not seriously attack this testimony, and the Court can rely upon it.  *See Phillips*, 415 F.3d at 1318 (explaining expert testimony can "provide background on the technology at issue, . . . explain how an invention works, . . . ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSITA], . . . [and] establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field" (citations omitted)).

overcome by a contrary construction dictated by the written description or prosecution history."

*Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016) (citation

omitted).  Indeed, "claim differentiation is a rule of thumb that does not trump the clear import of

the specification," *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009)

(citation omitted), and "[w]hile claim differentiation may be helpful in some cases, it is just one

of many tools used by courts in the analysis of claim terms," *Netcraft Corp. v. eBay, Inc.*, 549

F.3d 1394, 1400 n.1 (Fed. Cir. 2008).

Here, for the reasons stated above, this presumption has been rebutted by the

specification.  Accordingly, "exhaust duct module" is construed as "a section of pre-fabricated,

factory-built exhaust duct."[17]

c. "joint encasement section"

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "joint encasement section" | "one or more parts configured to encase the junction between two exhaust duct modules" | "one of multiple parts having a 3-dimensional profile that together encase the junction between two duct modules" | "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules" |

The term "joint encasement section" appears in claims 1 and 7–9.  In relevant part, Claim

1 claims "[a] modular fire-rated exhaust duct assembly comprising: . . . a joint encasement

---

[17] In their reply brief, Defendants for the first time argue DuraSystems's proposed construction (which the Court herein adopts) "impermissibly reads out disclosed embodiments," Reply Br. 13 (citation omitted), because their expert "testified that Plaintiff's proposed construction excludes laboratory exhaust ducts," *id.* (citing Crimi Dep. 52:9–24).  But Crimi said no such thing.  The cited passage shows he only testified the '569 Patent's *claims* do not relate to laboratory exhaust ducts, not DuraSystems's proposed construction of "exhaust duct module."  *See* Crimi Dep. 52:9–15.  Moreover, when asked whether the term "exhaust duct module" excludes laboratory exhaust ducts, he answered in the negative, explaining "when I see the term 'fire-rated exhaust duct modules[,'] that, based on present knowledge of the art, such a thing doesn't exist in certainly consensus standards."  *Id.* at 52:18–24.

section configured to be field connectable to each of said exhaust duct modules and encase said

junction." '569 Patent col. 8 ll. 47–48, col. 9 ll. 7–9, J.A. 0015–16. The parties do not dispute a

"joint encasement section" is meant to "encase the junction between two exhaust duct modules."

*See* Joint Claim Construction Chart 3. But, as explained below, they dispute the meanings of the

terms "encasement" and "section."

> i.    *"Encasement"*

The parties agree the plain and ordinary meaning of "encase" is "to enclose in or as if in a

case." Opening Br. 22 (citing *The American Heritage Dictionary*, *supra* at 284); *cf.* Pl.'s Br. 23

(referring to this definition as that of "encasement"). They differ on whether this definition

means a joint encasement section must have a 3-dimensional profile. Defendants assert "[a] case

has thickness—a 3-D profile," Opening Br. 22, and cite (albeit with little explanation) three

figures from the '569 Patent, *id.* (citations omitted). They also cite the prosecution history,

arguing Duffy disclaimed a "joint encasement section" that does not have a 3-dimensional

structure by distinguishing Callan, which teaches a joint encasement section that has a channel

strip. *See* Opening Br. 23. DuraSystems asserts Defendants' figure-based argument is legally

improper because limitations from the specification cannot be imported into the claims and their

prosecution history-based argument is factually improper because Duffy did not mention 3-

dimensional profiles when attempting to distinguish Callan. Pl.'s Br. 23.

The claims do not say anything about a "joint encasement section" having a 3-

dimensional profile. Defendants' attempts to limit their scope by arguing a "joint encasement

section" must have a 3-dimensional profile fail. *See Fujifilm Corp. v. Motorola Mobility LLC*,

Case No. 12-cv-03587-WHO, 2015 WL 757575, at *12 (N.D. Cal. Feb. 20, 2015) ("[N]either a

patent's specification nor its prosecution history may be used to 'narrow a claim term or deviate

from the plain and ordinary meaning unless the inventor acted as his own lexicographer or

intentionally disclaimed or disavowed claim scope.'" (quoting *Aventis Pharms. Inc. v. Amino*

*Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013)); *see also* discussion on prosecution history

disavowal *supra* pp. 24–25; discussion on specification disavowal *supra* pp. 34–36.

First, Defendants' reliance on Figures 7–9 of the '569 Patent is misplaced.  Defendants

chiefly rely on Figure 7 (which is referenced by Figures 8 and 9) in arguing their "proposed

construction is . . . consistent with the specification which depicts multiple parts having [a] 3-

dimensional profile, that when arranged together, encase the joint."  Opening Br. 22–23 (citation

omitted).  But "courts may not limit patent claims to what is depicted in the drawing figures,

because this would wrongly import limitations onto the claim from the specification, which is

fraught with danger."  *Net Results, Inc. v. United States*, 112 Fed. Cl. 133, 149 (Fed. Cl. 2013)

(quotation marks and citation omitted).  Indeed, "a patent need not illustrate the full scope of the

invention," *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir.

2011) (citation omitted), and "patent coverage is not necessarily limited to inventions that look

like the ones in the figures," *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333

(Fed. Cir. 2007) (citation omitted).  While figures can be limiting if they represent an entire

invention or are described using strict language, *see TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516

F.3d 1290, 1300–01 (Fed. Cir. 2008) (rejecting an attempt to discount the limiting effect of a

figure because the figure was not described with reference to a preferred embodiment and used

language such as "must" and "necessary"), the '569 Patent's "Brief Description of the Drawings"

makes clear Figure 7 only depicts an embodiment of the claimed invention, '569 Patent col. 3 ll.

49–53, J.A. 0013.  The Federal Circuit "will not countenance the importation of claim limitations

from a few specification statements or figures into the claims, particularly if those specification

extracts describe only embodiments of a broader claimed invention," *Comput. Docking Station*, 519 F.3d at 1374 (citation omitted), and neither will this Court.[18]

Second, Defendants do not demonstrate Duffy disclaimed a joint encasement section that does not have a 3-dimensional structure while prosecuting the '569 Patent. In rejecting the first draft of the '569 Patent, the examiner noted Callan "teaches a modular fire-rated exhaust duct assembly comprising: . . . a joint encasement section . . . configured to be field connectable to each of said exhaust duct modules and encase said junction." Non-Final Rejection ¶ 4, J.A. 0257–58. Duffy countered that Callan does not teach a joint encasement section because "the locking clip . . . described and taught by Callan" "does not encase the junction," as it "merely comprises a channel strip that makes a physical connection between adjacent sections. Amendment 11, J.A. 0296.

This did not change the examiner's mind. In rejecting the second draft of the '569 Patent, the examiner explained that based on the language of claim 1 thereof,

> the joint encasement section only functions to connect the duct modules and encase the junction. As seen in figures 1 and 10 of Callan, the locking clip . . . joins two duct sections together and also covers the junction of the joint and thus satisfies the requirements of the claims. Therefore, Callan does indeed teach a joint encasement section as recited in the claims.

Final Rejection ¶ 8, J.A. 0312. Duffy neither amended nor addressed the language regarding the joint encasement section in his Request for Continued Examination and Amendment, and the examiner did not address it in the Notice of Allowability.

Defendants say Duffy disclaimed a joint encasement section that does not have a 3-dimensional structure in responding to the examiner's first rejection because he "confirm[ed] that

---

[18] Moreover, it appears Defendants abandoned their figures-based argument in their reply brief. *See* Reply Br. 13–14 (stating "Defendants' proposed construction [does not] import[] limitations from the specification" and "Defendants' proposed construction flows specifically from *arguments made during prosecution*, not a particular embodiment" (emphasis added) (citations omitted)).

[his] 'joint encasement section' must 'encase the junction,'" whereas Callan's joint encasement section is "a flat 'channel strip' or locking clip [that] merely sits on top of the junction." Opening Br. 23; *see also id.* ("Plaintiff distinguished its application claims from Callan, a 3-dimensional structure (as opposed to a mere flat strip) that encloses the junction on all sides (as opposed to just one side) would be necessary."). However, as DuraSystems notes, Duffy did not "distinguish Callan based on the lack of a 3-dimensional profile," but because Callan's "joint encasement section" "does not 'encase the junction.'" *See* Pl.'s Br. 23 (quotation marks and citation omitted). In fact, the term "3-dimensional" does not appear once in Duffy's rebuttal. Defendants' position rests on the idea "[a] case has thickness—a 3-D profile," and that because Duffy emphasized his joint encasement section must "encase the junction," he declared his joint encasement section must have a 3-dimensional profile. But Defendants cite nothing in the prosecution history or anywhere else that supports the idea a joint encasement section that encases a junction must be 3-dimensional—the threshold proposition "[a] case has thickness—a 3-D profile" is not accompanied by a single citation. Duffy's rebuttal can hardly be classified as a "clear and unmistakable" disclaimer of a joint encasement section without a 3-dimensional structure. *See Mass. Inst. of Tech.*, 839 F.3d at 1119 (noting "for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable" (quotation marks omitted)).

This conclusion is further supported by the examiner's response to Duffy's rebuttal. *See Salazar*, 414 F.3d at 1347 ("Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."). In their reply brief, Defendants note DuraSystems "offers no explanation why the locking clip [in Callan] did not 'encase' the joint." Reply Br. 14. But the examiner noted it did, explaining Callan teaches a joint encasement section because "the

joint encasement section only functions to connect the duct modules and encase the junction" and "the locking clip . . . joins two duct sections together and also covers the junction of the joint and thus satisfies the requirements of the claim." Final Rejection ¶ 8, J.A. 0312. While the examiner ultimately granted Duffy's application (and therefore may have taken a different view of Duffy's rebuttal), he said nothing in the Notice of Allowability to suggest Duffy's "joint encasement section" has a 3-dimensional profile, and his silence certainly cannot constitute a disclaimer. *Cf. Salazar*, 414 F.3d at 1345 ("[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a clear and unmistakable disavowal of claim scope." (citation omitted)).

   ii.   *"Section"*

  The parties next dispute whether a joint encasement section must have multiple parts. *See* Joint Claim Construction Chart 3. Defendants say yes and note a dictionary defines "section" as "one of several component parts that may be assembled or reassembled." *See* Opening Br. 23–24 (emphasis omitted) (citing *Webster's New Collegiate Dictionary* 1036 (1980), Opening Br. Ex. T, ECF No. 31-21). DuraSystems takes no issue with this definition, *see* Pl.'s Br. 23 (citation omitted), arguing it does nothing to support Defendants' construction because a joint encasement section "is only one of several component parts of the 'exhaust duct assembly' and 'exhaust duct module' of the claims, the other component parts including . . . the inner duct liner, outer casing, thermal spacers, insulation, and flange connector," *see id.* (citation omitted).

  Nothing in the intrinsic record indicates a joint encasement section must have multiple parts. Therefore, the issue here is whether this definition supports Defendants' proposed construction. *See Helmsderfer*, 527 F.3d at 1382 (noting a court can rely upon a dictionary

definition in construing a claim term so long as it "does not contradict the meaning otherwise apparent from the intrinsic record"). Defendants contend the language "one of several component parts" shows a joint encasement section must in turn have multiple parts; "parts" are therefore parts of a "joint encasement section." DuraSystems asserts "parts" are not parts of a joint encasement section but parts of an exhaust duct module as a whole.

The '569 Patent shows DuraSystems is correct. The '569 Patent teaches an exhaust duct system that is "configured for assembly in the field," '569 Patent col. 2 ll. 24–25, J.A. 0012, and contains a number of exhaust duct modules, each of which having a number of distinct parts, including an inner duct liner, *id.* col. 8 ll. 50–51, J.A. 0015, an outer casing, *id.* col. 8 ll. 51, J.A. 0015, and thermal spacers, *id.* col. 8 l. 55, J.A. 0015. A joint encasement section is one of those parts. *See id.* col. 9 l. 7, J.A. 0016. Accordingly, the dictionary definition of "section" merely supports the unremarkable proposition that a joint encasement section is a part of an exhaust duct module and "parts" are not parts of a joint encasement section but of an exhaust duct module. It does not support adopting Defendants' proposed construction.

Moreover, Defendants' proposed construction does not make sense if "parts" were parts of a joint encasement section. If that were so, Defendants' proposed construction would provide that a joint encasement section is "one of multiple parts of a joint encasement section." And their proposed construction still does not hold water with "parts" constituting parts of an exhaust duct module. Indeed, if a joint encasement section is one of multiple parts of an exhaust module, it would be erroneous to note they (the inner duct, the outer casing, and such) "together encase the junction between two duct modules" when not all of them have that function; only the joint encasement section does.

But DuraSystems's construction is faulty as well, as it is unnecessary to note a joint encasement section has "one or more parts," given there is no guidance on how many parts it must have.  Moreover, even including the word "parts" could cause confusion, as it may not be entirely clear whether "parts" refer to parts of a joint encasement section or parts of an exhaust duct module.  *See, e.g.*, *j2 Glob. Commc'ns, Inc. v. Vitelity Commc'ns, LLC*, No. CV 11-07904 DDP (Ex), 2013 WL 5220173, at *6 (C.D. Cal. Sept. 13, 2013) (finding a word in a proposed claim construction was "unnecessary surplusage" and noting "[a]dding unnecessary verbiage is likely to confuse the jury, and, thus, frustrate one of claim construction's chief purposes" (citation omitted)).  Indeed, the briefing has borne out this concern.

Defendants' other arguments as to why a joint encasement section should be construed to have multiple parts are without merit.  First, they assert Figures 7–9 of the '569 Patent show a joint encasement section must have multiple parts.  But just as it is improper to rely upon these figures to argue a joint encasement section must have a 3-dimensional profile, it is improper to rely upon them to argue it must have multiple parts.  *See supra* at p. 45–46.

Second, they argue if a section is a part of an exhaust duct module, the word "section" would be surplusage.  *See* Reply Br. 14–15 ("Plaintiff chose to attach the word 'section' to the term 'joint encasement'; other components in the claim (e.g., flange connectors) are not modified by the word 'section.'  To read the word 'section' into every claimed component would improperly render the word 'section' in 'joint encasement section' surplusage." (citation omitted)).  In a vacuum, this argument is appealing, as "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."  *See Wasica*, 853 F.3d at 1288 n.10 (citation omitted).  But the rule against surplusage is not a hard and fast one.

50

First, the Federal Circuit has tolerated surplusage when the terms involved do not have different meanings.  In *Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365 (Fed. Cir. 2002), the Federal Circuit examined the terms "computer" and "computer system" and found the patent at issue used them as synonyms.  *Id.* at 1373.  While the court noted it usually would have been inclined to give meaning to the word "system," *see id.* (citation omitted), there was no reason to because the patent "provides no indication that the two terms mean different things," *id.* "Instead, the patent uses the term 'computer system' in the specification and the term 'computer' in the claims; nothing in the patent itself explicates their relationship or indicates any difference in meaning."  *Id.*; *see also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) ("[S]urplusage may exist in some claims." (citing *Pickholtz*, 284 F.3d at 1373)).

*Pickholtz* is instructive, as the terms "joint encasement" and "joint encasement section" are used interchangeably in the '569 Patent.  Indeed, while the '569 Patent often employs the term "joint encasement section," *e.g.*, '569 Patent col. 9 l. 32, J.A. 0016, it also uses the term "joint encasement" three times in the specification, *e.g.*, *id.* col. 7 ll. 15–16, J.A. 0015 ("The joint encasement . . . is configured to encase or surround the joint . . . ."), and does not indicate they mean anything different.  While the terms "joint encasement" and "joint encasement section" both appear in the specification, *see, e.g.*, *id.* col. 7 ll. 15–16, 41 J.A. 0015, only one of them ("joint encasement section") appears in the claims, *see, e.g.*, *id.* col. 9 l. 32, J.A. 0016; *see also Bioverativ Inc. v. CSL Behring LLC*, Civil Action No. 1:17-cv-00914-RGA, 2019 WL 1276030, at *7 (D. Del. Mar. 20, 2019) (noting while its construction of a term rendered language superfluous, the construction was permissible because "[t]he individual words of the term have

51

meaning, but the term does not add a new limitation because it is inherent in the rest of the claim" and it was "the only reasonable result considering the intrinsic record").

Second, in any case, "no canon of claim construction is absolute in its application," *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998), and, like the canon of claim differentiation, this canon can be overcome by the weight of the rest of the intrinsic evidence.  Indeed, in *Decisioning.com, Inc. v. Federated Department Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008), the Federal Circuit realized its construction of one claim term may have rendered the construction of another surplusage but stood by it in light of the intrinsic evidence.  *See id.* at 1312 n.6 ("In light of the intrinsic evidence that we have discussed, we conclude that the claims of the '007 patent are limited to a publicly-accessible 'remote interface' despite the fact that such a construction may render the term 'public' in claim 16 surplusage.").  In light of the foregoing discussion, the Court stands by its construction of "joint encasement section."[19]

Finally, Defendants argue a portion of Duffy's deposition testimony supports their proposed construction.  They posit he "testified that, when developing his '569 Patent invention, he considered using a non-modular, single piece to 'wrap-around' the duct, but rejected the approach because the single piece did not work well," Opening Br. 24 (citation omitted), admitting "[w]e have sometimes situations in . . . real life, in construction, where you can't wrap around a duct on a site," *id.* (quoting Dep. of William Duffy ("Duffy Dep.") 135:20–22, Opening Br. Ex. O, ECF No. 31-16).  A joint encasement section, therefore, cannot have only one part.

---

[19] Also, even if Defendants' surplusage argument were meritorious, it would not mean Defendants' proposed construction would be adopted.  Indeed, accepting their argument would only entail rejecting their dictionary definition, which provides the primary authority for their proposed construction.

This argument fails.  As DuraSystems notes, "[a]n applicant is not required to disclose all possible embodiments covered by a claim."  Pl.'s Br. 24 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[O]ur case law makes clear that a patentee need not describe in the specification every conceivable and possible future embodiment of his invention." (quotation marks omitted))).  While Defendants reason applicants cannot disclose "inoperative embodiments" and Duffy's testimony shows he "disclos[ed] the only working embodiment using 'joint encasement sections,'" Reply Br. 15 (emphasis omitted) (citing *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362–65 (Fed. Cir. 2018)), they are off base for two reasons.  First, the case they rely upon is inapposite.  *Everlight* concerns not claim construction, but the patent code's enablement requirement, under which a specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  *See* 35 U.S.C. § 112(a); *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) ("[T]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." (alteration in original) (quotation marks omitted)).  Indeed, the issue there was whether a specification taught a POSITA how to make the claimed device without undue experimentation as of the patent's effective filing date.  *Everlight*, 896 F.3d at 1363.  "Determining whether written-description and enablement requirements are met is distinct from determining claim scope."  *Optis Wireless Tech., LLC v. Apple Inc.*, Case No. 2:19-cv-00066-JRG, 2020 WL 1692968, at *10 (E.D. Tex. Apr. 7, 2020) (citing *Phillips*, 415 F.3d at 1327 (cautioning "we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction")).

Second, in any event, Duffy did not even testify a one-section joint encasement section is "inoperative" or does not work. Duffy testified such a joint encasement section does not work in some situations, not that it does not work at all. *See* Duffy Dep. 135:16–24 (explaining he used four separate pieces as opposed to one because while one, wrap-around joint encasement section could work, "[w]e have *sometimes* situations . . . in construction, where you can't wrap around a duct on a site," as "[t]here is just no room." (emphasis added)). There may well be some sites in which there is sufficient room to "wrap around" a duct, and in those situations, a one-section "joint encasement section" would work.

*   *   *

For the foregoing reasons, the term "joint encasement section" is construed as "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules."

    d.    <u>"joined directly"</u>

| Claim Term | DuraSystems's Construction | Defendants' Construction | Court's Construction |
|---|---|---|---|
| "joined directly" | Plain and ordinary meaning; no construction needed | "joined without any intervening components" | No construction needed |

The term "joined directly" appears in each of the Independent Claims. For example, Claim 1 partly teaches "a first exterior flange connector, said first exterior flange connector being joined directly to one end of said inner duct liner, and one end of each of said exhaust duct modules being configured for receiving said first exterior flange connector." '569 Patent col. 8 ll. 60–64, J.A. 0015. Defendants purport to "propose[] a construction that is based on the plain and ordinary meaning but ensures necessary clarification that no intervening components are between the exterior flange connector and the inner duct liner." Opening Br. 24–25 (citation

54

omitted).  DuraSystems argues this term should not be construed because there is no dispute

regarding its construction and construing it "would not change the outcome of any claim or

defense in the case."  Pl.'s Br. 25.

Only terms that are in controversy must be construed, "and only to the extent necessary to

resolve the controversy."  *Vivid Techs., Inc.*, 200 F.3d at 803 (citation omitted).  Indeed, just

because claim construction is an issue of law does not mean a district judge "must repeat or

restate every claim term."  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir.

1997).  Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical

scope, to clarify and when necessary to explain what the patentee covered by the claims, for use

in the determination of infringement."  *Id.*; *cf. Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637

F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing

claims is not to redefine claim recitations or to read limitations into the claims to obviate factual

questions of infringement and validity but rather to give meaning to the limitations actually

contained in the claims . . . .").  When a court is presented with a purported claim construction

dispute, "[a] threshold question . . . is [therefore] whether and to what extent construction is even

necessary."  *Warner Chilcott Co. v. Mylan Inc.*, Civil Action Nos. 11-6844 (JAP), 11-7228(JAP),

2013 WL 3336872, at *3 (D.N.J. July 2, 2013) (citation omitted).

As the term "joined directly" is not in controversy, it is not necessary to construe it.

Indeed, while Defendants claim "[t]he parties dispute the meaning of the word 'directly' tied to

the word 'joined,'" Opening Br. 25, they do not identify any dispute.  In fact, they do not even

identify DuraSystems's supposedly contrary position.  While they say their proposed

construction "ensures necessary clarification," *id.* at 24–25, and cite a Federal Circuit case that

explains a term may need to be construed when it has "more than one 'ordinary' meaning or

when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute," *id.* at 25 (quoting *O2 Micro Int'l*, 521 F.3d at 1361), they neither explain why clarification is necessary nor identify more than one "ordinary meaning" of "joined directly."

Defendants implicitly argue this term should be construed because it is relevant to whether they can show the existence of an acceptable non-infringing alternative to the invention claimed in the '569 Patent. *See* Reply Br. 15. They are correct that the existence of a non-infringing alternative is relevant to two types of patent infringement damages: lost profits, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) ("[L]ost profits, . . . cannot be recovered if acceptable non-infringing alternatives were available during the period of infringement."), and royalties, *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed. Cir. 1996) (directing a district court to reconsider its reasonable royalty award in light of the defendant's ability to market a non-infringing alternative). But "[w]hether a non-infringing alternative is acceptable is a question of fact," *Meridian Mfg., Inc. v. C & B Mfg., Inc.*, 340 F. Supp. 3d 808, 846 (N.D. Iowa 2018) (citing *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991)), and "while claim construction involves determining the scope of the claim terms as a matter of law, it is not the task of the court to determine whether" a non-infringing alternative exists, *cf. Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2993856, at *6 (N.D. Cal. July 20, 2012) (citation omitted) (declining to construe a claim term because the dispute thereon was not about its construction but about the factual issue of whether it was disclosed by a prior art reference). This Court will not, under the guise of claim construction, give the term "joined directly" whatever clarification is required to facilitate a non-infringing alternative determination and thereby take that issue away from a jury. *Cf. PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) (determining a court may

not "under the rubric of claim construction, . . . give a claim whatever additional precision or specificity is necessary to facilitate a comparison between the claim and [an anticipatory reference] . . . the task of determining whether the [reference discloses the claim limitation] is for the finder of fact").

Accordingly, the claim term "joined directly" shall not be construed.

## II.     The Motions for Leave to File Under Seal

DuraSystems and Defendants both move for leave to file under seal documents supporting their respective claim construction briefs.  Defendants move for leave to file under seal excerpts from Duffy's deposition because they contain "information represented by [DuraSystems] as being highly sensitive business information, the disclosure of which is likely to cause significant harm to [DuraSystems]."  Defs.' Mot. Leave File Under Seal 1.  DuraSystems moves for leave to file under seal excerpts of the deposition of Billie Joe Sims because the transcript thereof was "designated by counsel for Defendants as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY and therefore falls under the protection of the parties' Stipulated Protective Order and the protection of the Court."  *See* Pl.'s Mot. Leave File Under Seal 1.  Both motions are unopposed.

Generally, "the record of a judicial proceeding is public."  *Jessup v. Luther*, 277 F.3d 926, 927 (7th Cir.[20] 2002).  Those "who want secrecy should opt for arbitration. When they call on the courts, they must accept the openness that goes with subsidized dispute resolution by

---

[20] A motion for leave to file under seal, which does not involve substantive issues of patent law, is governed by the law of the regional circuit in which a district court sits.  *See Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214, 1220 (Fed. Cir. 2013) (citation omitted) (applying regional circuit law to determine whether the district court abused its discretion in denying a motion for leave to file under seal); *see also ABS Glob., Inc. v. Inguran, LLC*, 14-cv-503-wmc, 2017 WL 3588290, at *1 n.2 (W.D. Wis. Apr. 5, 2017) ("As with other issues not exclusive to patent law, the Federal Circuit applies regional circuit law regarding confidentiality." (citing *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 497 F. App'x 66, 67 (Fed. Cir. 2013))).  Therefore, the Court shall follow Seventh Circuit law.

public (and publicly accountable) officials." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). As such, "when a court finds it necessary to consider certain information in making a decision, that information should ordinarily be made available to public scrutiny in order to preserve the integrity of the judicial process." *Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, Case No. 4:13-cv-4021-SLD-JAG, 2013 WL 5973938, at *20 (C.D. Ill. Nov. 8, 2013) (citing *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002); *Union Oil*, 220 F.3d at 567–68)). As the Seventh Circuit has explained, "those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Baxter*, 297 F.3d at 545.

These principles are supplemented by this Court's Local Rules. Under Local Rule 5.10:

A party who has a legal basis for filing a document under seal without prior court order must electronically file a motion for leave to file under seal. The motion must include an explanation of how the document meets the legal standards for filing sealed documents. The document in question may not be attached to the motion as an attachment but rather must be electronically filed contemporaneously using the separate docket event "Sealed Document."

CDIL-LR 5.10(A)(2).

If a motion for leave to file under seal is denied, "the document tendered will remain under seal, and it will not be considered by the presiding judge for any purpose." *Id.* 5.10(A)(4).

As an initial matter, both motions are substandard. First, Defendants erroneously filed their motion both in regular order and under seal. Defs.' Mot. Leave File Under Seal (filed publicly); Defs.' Mot. Leave File Under Seal Certain Docs., ECF No. 34 (filed under seal with the sealed documents attached as exhibits thereto). Second, and more importantly, both motions contain little to no explanation as to how they "meet[] the legal standards for filing sealed documents." *See* CDIL-LR 5.10(A)(2). While Defendants say the sealed excerpts from Duffy's

deposition contain information that constitutes "highly sensitive business information, the
disclosure of which is likely to cause significant harm to [DuraSystems]," Defs.' Mot. Leave File
Under Seal 1, they do not explain how disclosure could harm DuraSystems or why such harm
could justify secrecy. *See Baxter*, 297 F.3d at 547 ("Beyond asserting that the document must be
kept confidential because we say so (the 'agreement is, by its terms, confidential'), this contends
only that disclosure 'could . . . harm Abbott's competitive position.'  How?  Not explained.  Why
is this sort of harm (whatever it may be) a legal justification for secrecy in litigation?  Not
explained." (alteration omitted)).  While DuraSystems states the transcript of the deposition of
Billie Joe Sims was "designated by counsel for Defendants as HIGHLY CONFIDENTIAL-
ATTORNEYS EYES ONLY," *see* Pl.'s Mot. Leave File Under Seal 1, just because Defendants'
counsel said they are confidential does not make them so under Seventh Circuit precedent, *see
Orthofix Inc. v. Gordon*, Case No. 1:13-cv-01463-SLD-TSH, 2016 WL 1273160, at *5 (C.D. Ill.
Mar. 31, 2016) ("[T]he parties have simply indicated in their motions that the documents in
question have been designated 'Confidential' by agreement of the parties, and offer this as
sufficient reason that the documents be filed under seal. This is inadequate; as the [Local Rules]
state[], motions to file under seal must provide a legal basis for granting the request."); *cf. Union
Oil*, 220 F.3d at 567–68 (explaining "[c]alling a settlement confidential does not make it a trade
secret, any more than calling an executive's salary confidential would require a judge to close
proceedings if a dispute erupted about payment (or termination)" and noting "requests to seal
proceedings in order to implement the parties' preference for seclusion. . . . have been uniformly
rejected" (collecting cases)).

     However, the Court has not relied on any portion of the documents filed under seal in
addressing the parties' claim construction disputes.  Accordingly, both motions for leave to file

under seal are denied, and the sealed documents shall remain sealed. *See Bd. of Trs. of Univ. of Ill. v. Micron Tech., Inc.*, 245 F. Supp. 3d 1036, 1043 (C.D. Ill. 2017) (denying a motion for leave to file under seal after noting the material portions of the documents relevant thereto were not relied upon). The Court will not consider them for any purpose. *See* CDIL-LR 5.10(A)(4).

## CONCLUSION

For the foregoing reasons, consideration of the claim terms asserted to be indefinite is DEFERRED and the motions for leave to file under seal, ECF Nos. 33, 37, are DENIED. The claim terms not asserted to be indefinite are, in accordance with and subject to the above discussion, construed as follows:

- "thermal spacers thermally isolating": "components that maintain a space between the inner duct liner and outer casing that limit the amount of heat conducted through the components so that they do not create fail points on the inner duct liner or outer casing during fire rating testing"

- "exhaust duct module": "a section of pre-fabricated, factory-built exhaust duct"

- "joint encasement section": "a section of an exhaust duct module configured to encase the junction between two exhaust duct modules"

- "joined directly": No construction needed

Entered this 3rd day of September, 2021.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE