UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DURASYSTEMS BARRIERS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-01388-SLD-RLH |
| | ) | |
| VAN-PACKER CO. and JEREMIAS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Defendants Van-Packer Co. and Jeremias, Inc.'s motion to dismiss, ECF No. 125.[1]  Defendants seek dismissal of Plaintiff DuraSystems Barriers Inc.'s ("DuraSystems") suit for patent infringement on grounds that DuraSystems lost standing to litigate when it sold the relevant patent to a third party.  Defendants' motion to dismiss is DENIED because DuraSystems did not transfer its right to litigate this action when it assigned the patent.

## BACKGROUND

DuraSystems filed suit against Van-Packer Co. in 2019.  In 2020, it filed an amended complaint alleging that both Defendants infringed its U.S. Patent No. 10,024,569 (the "'569 Patent").  The Court granted summary judgment on the issue of infringement, Mar. 31, 2023 Order 33, ECF No. 85, and the parties dismissed all other claims and counterclaims to allow for an immediate appeal, *see* Jan. 18, 2024 Text Order.  The judgment was affirmed on appeal, Fed. Cir. J., ECF No. 100, and a trial was set for a resolution of the remaining issues: willfulness and damages, Aug. 21, 2025 Text Order.

---

[1] A redacted version of the motion is available on the public docket at ECF No. 126.

During the appeal, on June 24, 2024, DuraSystems entered into an Asset Purchase Agreement (the "Agreement") with VaughanAir Canada ULC ("VaughanAir"). *See generally* Agreement, Br. Supp. Mot. Seal Ex. A, ECF No. 140-1.  In the Agreement, VaughanAir purchased from DuraSystems "all of its right, title and interest in and to all assets, properties and rights of every nature, kind and description" related to the Duct Business, including the '569 Patent. *Id.* at § 2.1; Schedules of Transferred Assets 9, Mot. Dismiss Ex. C, ECF No. 125-3.  The transfer included "all rights to any Actions of any nature available to or being pursued by [DuraSystems] to the extent related to the Duct Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise."  Agreement § 2.1(f).  Pursuant to the Agreement, DuraSystems assigned the '569 Patent to VaughanAir on the same day.  *See generally* Patent Assignment, Mot. Dismiss Ex. B, ECF No. 126-2.

The Agreement contains a subsection in which DuraSystems "covenants and agrees that it will use its best efforts to prosecute the Van Packer Litigation and defend and protect the Challenged IP."  Agreement § 6.2.  The subsection provides that DuraSystems shall remain "solely responsible for . . . any attorneys fees and related costs and expenses incurred in the Van Packer Litigation," and that, if damages are awarded in the case or a settlement is reached, DuraSystems "shall be entitled to receive all such amounts."  *Id.* § 6.2(a), (c).  DuraSystems may not, however, settle the case without VaughanAir's prior written consent.  *Id.* § 6.2(b).  DuraSystems also "shall permit" VaughanAir to participate in the Van Packer Litigation if it so desires.  *Id.*

Based on the Agreement, Defendants contend that DuraSystems no longer has standing to continue the present action.  They claim that DuraSystems's assignment of the '569 Patent stripped it of its exclusionary right in the patent, meaning any violation of the patent no longer

2

inflicts a legal injury on DuraSystems.  Mot. Dismiss 4–6.  DuraSystems filed a response

opposing the motion.  *See generally* Resp. Mot. Dismiss, ECF No. 131.  It argues that the Court

should not reach the issue of DuraSystems's standing because the Federal Circuit has definitively

decided the issue and because Defendants are estopped by their prior litigation position from

arguing that DuraSystems lacks standing.  *Id.* at 4–6.  DuraSystems also contends that, in any

case, the Agreement did not deprive it of standing.  *Id.* at 6–8.

## DISCUSSION[2]

### I.    Law of the Case

DuraSystems argues that its continued standing after the transfer of the '569 patent is the

law of the case.  Resp. Mot. Dismiss 4–5.  It claims that the Federal Circuit, by holding that

VaughanAir did not have to be joined to the appeal, decided the issue of standing and,

consequently, that this Court does not have the power to reconsider DuraSystems's standing.  *Id.*

Defendants respond that the Federal Circuit did not decide how the Agreement impacts

DuraSystems's standing, indeed it could not have, since the court did not have access to the

Agreement.  Reply Supp. Mot. Dismiss 2–3, ECF No. 136.

The law of the case doctrine is a "flexible" doctrine wherein an appellate court decision

"establishes the law of the case and is binding on a district judge asked to decide the same issue

in a later phase of the same case, unless there is some good reason for reexamining it."  *United*

*States v. Mazak*, 789 F.2d 580, 581 (7th Cir. 1986).  The doctrine only applies when there is an

---

[2] Because the Federal Circuit would have exclusive jurisdiction over this appeal, *see* 28 U.S.C. § 1295(a)(1), its case law is binding on the Court.  *See Sample v. United States*, 838 F. Supp. 373, 375 (N.D. Ill. 1993); *Bradley v. L'Oreal USA, Inc.*, No. 10-cv-433-DRH, 2010 WL 3463203, at *2 (S.D. Ill. Aug. 30, 2010).  But Seventh Circuit precedent controls for any procedural matters that are not unique to patent law.  *SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, 261 F. Supp. 2d 1002, 1006 (N.D. Ill. 2003); *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1374 (Fed. Cir. 2021) ("The 'law of the case' is 'a procedural matter not unique to patent law' to which we apply 'the precedent of the regional circuit in which the case arose' . . . ." (quoting *Exxon Corp. v. United States*, 931 F.2d 874, 877 n.4 (Fed. Cir. 1991))).

"actual decision of an issue," *Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020) (quotation marks and alteration omitted), and "does not apply at all where the precise issue presented differs from the one decided earlier." *Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022).

The law of the case doctrine does not apply here. The Federal Circuit did deny DuraSystems's motion to join VaughanAir as a party, *see generally* Fed. Cir. Order on Mot., Resp. Mot. Dismiss Ex. C, ECF No. 131-3, but this decision did not actually decide whether DuraSystems had standing. In its four-sentence order, the Federal Circuit denied the motion because it "[could ]not say that DuraSystems ha[d] demonstrated the need for joinder" given DuraSystems's reassurances that it remained "the real party in interest." *Id.* at 2 (quotation marks omitted). The decision does not discuss standing, and both DuraSystems's and Defendants' briefings assured the court that the motion did not implicate standing. *See* Mot. Join Party 2, Resp. Mot. Dismiss Ex. A, ECF No. 131-1; Resp. Mot. Join Party 2, Resp. Mot. Dismiss Ex. B, ECF No. 131-2. This falls far short of an "actual decision of [the] issue." *Surprise*, 968 F.3d at 663 (quotation marks and alteration omitted).

During oral arguments, DuraSystems argued that the standing issue was necessarily raised by its motion to join VaughanAir and, consequently, that the Federal Circuit's decision necessarily decided the issue. This is incorrect. DuraSystems moved to join VaughanAir as a party pursuant to Federal Rule of Civil Procedure 21. Mot. Join Party 2. Rule 21 allows a court to "at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Joinder under Rule 21 is allowed when it "merely puts the principal, the real party in interest, in the position of his avowed agent." *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952). As grounds for joinder, DuraSystems stated that it was merely joining the real party in interest. Mot. Join Party 3. However, DuraSystems also stated that it "continue[d] to be the real party in interest," *id.* at 2,

and "adequately represented" VaughanAir's interests, *id.* at 3–4.  The Federal Circuit relied on these statements to hold only that DuraSystems had not met its burden to demonstrate the need for joinder.  Fed. Cir. Order on Mot. 2.  It did not review or have access to the Agreement when making this decision.  Reply Supp. Mot. Dismiss 1–2.  The Federal Circuit's holding on joinder is thus best considered an evaluation of the sufficiency of DuraSystems's brief, not an analysis of standing.  Indeed, without access to the Agreement, the court could not have analyzed its effect on DuraSystems's standing.  Because the Federal Circuit's decision does not decide the question of standing, nor is there any indication that the court considered the issue, there is no "law of the case" on DuraSystems's standing.

## II.    Judicial Estoppel

DuraSystems also argues that the Court should not reach the standing issue because Defendants are judicially estopped from making the argument.[3]  Resp. Mot. Dismiss 5–6.  Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."  *Davis v. Wakelee*, 156 U.S. 680, 689 (1895).  DuraSystems argues that Defendants' present motion is contrary to their opposition to the joinder of VaughanAir on appeal.  Resp. Mot. Dismiss 5–6.  In the appeal of this case before the Federal Circuit, Defendants did oppose the joinder of VaughanAir.  *See generally* Resp. Mot. Join Party.  In doing so, they highlighted that DuraSystems's position was that DuraSystems remained the real party in interest and was entitled to "all rights to the proceeds of this appeal."  *Id.* at 1–2.  Defendants also claimed that the transfer of the '569 Patent did not implicate standing before the

---

[3] Because the Court finds that Defendants are not judicially estopped from making the argument, it need not address the questionable proposition that judicial estoppel could prevent the Court from addressing a jurisdictional issue it is obligated to raise *sua sponte*, *see Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020).

Federal Circuit but argued that even if standing had been at issue, the Federal Circuit could not

"resolve that issue in the first instance, especially where it ha[d] not had the benefit of reviewing

the assignment agreement." *Id.* at 2. Defendants now argue that judicial estoppel does not apply

because its former opposition to joinder "turned upon the inability to review the Agreement" and

that now that they have been given access to its terms, their position has understandably

changed. Reply Supp. Mot. Dismiss 3.

"The circumstances under which judicial estoppel may appropriately be invoked are

probably not reducible to any general formulation of principle." *New Hampshire v. Maine*, 532

U.S. 742, 750 (2001) (quotation marks and alteration omitted). There are, however, several

relevant considerations.

> First, a party's later position must be clearly inconsistent with its earlier position.
> Second, courts regularly inquire whether the party has succeeded in persuading a
> court to accept that party's earlier position, so that judicial acceptance of an
> inconsistent position in a later proceeding would create the perception that either
> the first or the second court was misled. . . . A third consideration is whether the
> party seeking to assert an inconsistent position would derive an unfair advantage or
> impose an unfair detriment on the opposing party if not estopped. . . . Additional
> considerations may inform the doctrine's application in specific factual contexts.

*Id.* at 750–51 (quotation marks omitted).

In this case, Defendants are not judicially estopped from seeking dismissal for lack of

standing. The doctrine does not apply because their current position is not "clearly inconsistent"

with a previous position. Defendants' arguments on appeal were about joinder, not standing,

which they only mentioned in the context of when the Federal Circuit's jurisdiction attached.

Further, when opposing joinder, Defendants did not have access to the Agreement. Reply Supp.

Mot. Dismiss 3. Thus, although their current position is in tension with their former opposition

to joinder, the discrepancy is reasonable given the difference in information access.

Because DuraSystem's standing to continue this litigation was not decided by the Federal Circuit, and because Defendants are not estopped from raising the issue, the Court proceeds to the merits of the standing question.

**III.    Standing**

    **a.  Legal Standard and Development**

The Constitution only grants federal courts the power to hear "cases" and "controversies."  U.S. Const. art. III, § 2.  The doctrine of standing ensures that courts only hear disputes "which are traditionally thought to be capable of resolution through the judicial process," namely those in which "the party seeking relief has 'alleged such a personal stake in the outcome of the controversy'" as to ensure the presence of concrete adverseness.  *See Flast v. Cohen*, 392 U.S. 83, 97, 99 (1968) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  To comport with this conception of judicial power, a plaintiff's standing to pursue a cause of action is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Because standing is a jurisdictional requirement, *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020), courts "have an obligation to assure [them]selves of litigants' standing under Article III."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quotation marks omitted).  A deficiency in standing may be raised at any time and is not subject to waiver.  *United States v. Hays*, 515 U.S. 737, 742 (1995). If a court concludes that the plaintiff lacks standing, it must dismiss the case.  *Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022).

A party has standing to bring suit if they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  At issue in

this case is whether DuraSystems has suffered an injury in fact. Defendants claim that DuraSystems has not suffered an injury because it no longer holds the '569 Patent. Mot. Dismiss 4–6. It follows, they continue, that any infringement of the patent harms the current patent holder, not DuraSystems. *Id.*

Caselaw on the "injury in fact" component of standing is notoriously difficult to decipher, particularly as it relates to standing to bring statutory causes of action. *See Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 981 (7th Cir. 2023) (Ripple, J., dissenting) ("A difficult and recurring theme in standing jurisprudence is the significance of congressional action."). Under the label "statutory standing," the Supreme Court long described the ability to bring statutory causes of action as jurisdictional. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 114–19 (1998) (Stevens, J., concurring) (collecting cases). In some cases, the Court's language even suggested that such questions impacted Article III standing. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972) ("Where . . . Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff."). In this line of cases, standing doctrine eventually evolved such that a statute could "creat[e] legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

In accordance with this guidance, the Federal Circuit for decades considered Article III standing to bring a claim for patent infringement, a statutory cause of action, to stem from Congress's creation of a cause of action. *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995); *Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333,

1345 (Fed. Cir. 2001); *WiAV Sols. LLC v. Motorola, Inc*, 631 F.3d 1257, 1264 (Fed. Cir. 2010). That is, it repeatedly held that "[s]tanding to sue for patent infringement derives from the Patent Act." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1376 (Fed. Cir. 2000). Under the Patent Act, only a "patentee," including a successor in title, 35 U.S.C. § 100(d), has a remedy by civil action for infringement of the patent. 35 U.S.C. § 281. Whether a plaintiff qualifies as a "patentee" under Section 281 hinges on whether it has legal title to the patent, *Rite-Hite*, 56 F.3d at 1551, determined by asking whether the plaintiff holds an "exclusionary right" therein, *WiAV Sols.*, 631 F.3d at 1264–65. Under the test that developed, a party had standing to sue as a patentee if they held "all substantial rights" to the patent. *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000).

A line of cases emerged applying this test to situations involving patent transfers. In these cases, the Federal Circuit outlined what rights must be transferred in order to convey "all substantial rights" in a patent. In *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 1580–81 (Fed. Cir. 1991), the Federal Circuit held that an agreement to assign a patent in the future did not transfer legal title to a patent, as was necessary to confer standing to sue for money damages, even if it transferred equitable rights. Four years later, in *Rite-Hite*, the court held that licensing agreements do not confer legal title if they do not convey the right to exclude others from making, using, or selling inventions based on the patent. 56 F.3d at 1552–53. While this right to exclude others from making the patent was necessary to confer standing, the court soon clarified that not all rights to a patent are similarly critical. *See Speedplay*, 211 F.3d at 1252 (holding that an exclusive license conveyed sufficient rights to the plaintiff such that the rights retained by the transferor—the right to dictate markings on products sold abroad and the right to inspect the licensee's books and records—did not amount to a "substantial proprietary right").

9

Though the Federal Circuit considered the right to exclude necessary for standing, it did not consider it sufficient. In *Prima Tek II*, 222 F.3d at 1380–81, the court held that a licensee did not have standing despite a licensing agreement in which the patent owner both granted the licensee the ability to sue for infringement and agreed to be bound by judgments against the licensee." *Id.* at 1381. It reasoned, "[t]o hold otherwise would be to allow a patent owner to effectively grant a 'hunting license,' solely for the purpose of litigation . . . . The Supreme Court long ago disapproved of such arrangements." *Id.* (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 42 (1923)). The Federal Circuit reiterated that point in *Propat International Corp. v. Rpost, Inc.*, 473 F.3d 1187 (Fed. Cir. 2007). The *Propat* court held that a licensing agreement transferring the responsibility to license the patent, enforce the licensing agreement, and sue infringers did not transfer "all substantial rights" in the patent. *Id.* at 1190–91. The court stated: "It has long been held that a 'right to sue' clause in a contract, unaccompanied by the transfer of other incidents of ownership, does not constitute an assignment of the patent rights that entitles the transferee to sue in its own name." *Id.* at 1192.

In sum, the Federal Circuit developed a doctrine wherein a patent transfer could confer standing upon the transferee but only if it transferred "all substantial rights" in the patent. To have standing under this test, a plaintiff must have the right to exclude others from infringing upon the patent. However, a party could not establish standing based *only* on a right to exclude, or a right to sue for infringement; such a right amounted to a mere "hunting license."

Meanwhile, the Supreme Court was clawing back on its statutory standing jurisprudence. In *Steel Co.*, while the Court still treated statutory standing as jurisdictional, it made clear that statutory standing could not take priority over Article III standing. *Steel Co.*, 523 U.S. at 97 n.2. Four years later, it refrained from commenting on whether an arguable cause of action is

10

necessary for courts to have jurisdiction over statutory claims. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002). From such cases, lower court judges began to conclude that standing doctrines derived from sources other than Article III are not jurisdictional. *See Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 183 (D.C. Cir. 2012) (Kavanaugh, J., concurring) ("In my view, Supreme Court precedent makes clear . . . that prudential standing is not jurisdictional."). The death knell came in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). The Supreme Court was presented with the question of whether the plaintiff had a cause of action under the Lanham Act. *Id.* at 128. It recognized that the Court "ha[d] on occasion referred to this inquiry as 'statutory standing' and treated it as effectively jurisdictional." *Id.* n.4. Such a description, however, it criticized as "misleading," since the absence of a statutory cause of action does not go to a court's constitutional power to hear a case. *Id.* As a result, no matter what causes of action Congress might create, "under Article III, an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). As a constitutional matter, "statutory standing" was dead.

In 2019, the Federal Circuit reconsidered its standing jurisprudence in light of *Lexmark*. *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019). Because Federal Circuit caselaw "often treated 'statutory standing,' i.e. whether a party can sue under a statute such as § 281, as jurisdictional," the court concluded that "*Lexmark* is irreconcilable with our earlier authority treating § 281 as a jurisdictional requirement." *Id.* Accordingly, it held that "whether a party possesses all substantial rights in a patent does not implicate standing or subject-matter jurisdiction." *Id.* at 1235–36. The consequences of this decision cannot be overstated. Whether a plaintiff is a "patentee" under § 281 is no longer

relevant to standing.  Neither is the "substantial rights" test.  Now, "the question for the injury-in-fact threshold is whether a party has *an* exclusionary right." *Intell. Tech. LLC v. Zebra Tech. Corp.*, 101 F.4th 807, 814 (Fed. Cir. 2024).  If a party has an exclusionary right, it has Article III standing.

### b.  Analysis

Defendants contend that DuraSystems no longer has any exclusionary rights in the '569 Patent.  Mot. Dismiss 4–6.  They argue that DuraSystems lost standing when it transferred to VaughanAir "all of its right, title and interest in and to all assets, properties and rights of every nature, kind and description" related to the Duct Business, including "all rights to any Actions of any nature available to or being pursued by [DuraSystems] to the extent related to the Duct Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise."  Agreement § 2.1(f).  DuraSystems contends that it retained its exclusionary rights as it relates to this litigation by contracting to continue this litigation.  Resp. Mot. Dismiss 7.  It points to the portion of the Agreement where it "covenants and agrees that it will use its best efforts to prosecute the Van Packer Litigation and defend and protect the Challenged IP."  Agreement § 6.2.  Under that contractual subsection, DuraSystems remains "solely responsible for . . . any attorneys fees and related costs and expenses incurred in the Van Packer Litigation," and "shall be entitled to receive all [damage awards or settlement payments]," though it may not settle the case without VaughanAir's consent.  *Id.* §§ 6.2(a), (c).

Since *Lone Star*, the Federal Circuit has decided one case that is remarkably similar to the one now before the Court.  In *Lowe v. ShieldMark, Inc.*, Nos. 2023-1786, 2023-1871, & 2023-1893, 2025 WL 893211 (Fed. Cir. Mar. 24, 2025), *cert. denied*, No. 25-169, 2025 WL 2824222 (U.S. Oct. 6, 2025), after commencing a suit for patent infringement, the plaintiff transferred his

"entire right, title and interest" in the patent at issue, including "any cause(s) of action and damages accruing prior to this assignment." *Id.* at *2 (quotation marks omitted). In line with longstanding standing doctrine, the court held that, because Lowe owned the patent until December 9, 2021, "any infringement of the patent before that date harmed Lowe as the patent owner." *Id.* at *5; *see Rite-Hite*, 56 F.3d at 1551 ("Generally, one seeking money damages for patent infringement must have held legal title to the patent at the time of the infringement."); *Crown Die & Tool*, 261 U.S. at 41 ("[T]he injury inflicted by an act of infringement falls upon the individual who owns the monopoly at the date of the infringement." (quotation marks omitted)). However, the court found that the plaintiff no longer had standing to pursue his infringement claim because the transfer contained an "express and unambiguous transfer of the right to sue for infringement prior to" the transfer of the patent. *Lowe*, 2025 WL 893211, at *5. Such an express and unambiguous transfer "deprived Lowe of Article III standing." *Id.* Lowe argued that it still had standing because, at the same time it transferred ownership of the patent, it orally received a license containing an "exclusive right to continue to assert infringement against alleged infringers" of the patent, "expressly including" the case immediately before the court. *Id.* (quotation marks omitted). The district court in *Lowe* found that there was not sufficient evidence to prove that such an agreement existed, and the Federal Circuit found no clear error in that finding of jurisdictional fact. *Id.* The Federal Circuit consequently concluded:

> Because the district court did not clearly err by finding inadequate evidence of an oral licensing agreement, we need not address whether any agreement that returned Lowe's right to sue for infringement prior to December 9, 2021, would have constituted a mere 'hunting license.' Lowe lost standing on December 9, 2021, when he transferred his 'entire right, title and interest' in the '664 patent, including the right to sue for past infringement during the time he owned the patent.

*Id.* at *6.

In this case, DuraSystems claims it expressly, by the terms of the Agreement, retained the right to pursue the immediate action.  Resp. Mot. Dismiss 7.  This argument presents two questions for the Court.  First, whether DuraSystems expressly and unambiguously transferred the right to sue for Defendants' prior infringement.  If it did not, then under the rule from *Lowe* it was never divested of standing in this case.  Second, if DuraSystems did transfer the right to sue, whether the Agreement's separate carve-out for rights to this litigation can confer standing in this case or if such a carve-out is a mere "hunting license."[4]  DuraSystems has standing here on both grounds.  It did not expressly and unambiguously transfer the right to litigate this case.  Even if it did, the carve-out for rights to this lawsuit are sufficient to confer standing.

### i. Contractual Transfer of Right to Litigate

DuraSystems maintains that, by the terms of the Agreement, it expressly retained the right to litigate this action.  Resp. Mot. Dismiss 7.  Defendants claim that DuraSystems has only the obligation to litigate; the right was transferred to VaughanAir.  Mot. Dismiss 5.  Both parties contend that the issue is squarely controlled by Federal Circuit precedent.  During oral arguments, they especially focused on the Agreement's requirement that DuraSystems receive VaughanAir's consent before settling, subject to a reasonableness restriction.  Defendants direct the Court's attention to *Propat*.  The court there held that a transfer of rights to enforce and license a patent was insufficient to confer standing.  473 F.3d at 1190–91.  It concluded that the transferor retained "an ownership interest in the patent," evidenced in part by its monetary interest in any litigation and its right to veto licensing and litigation decisions.  *Id.* at 1191.  As a result, the transferee did not have "all substantial rights in the patent."  *Id.*  Defendants claim that

---

[4] Because there is only one agreement in this case, as opposed to the alleged two agreements in *Lowe*—one transferring the patent and then one reconveying certain rights back to Lowe—it is not clear that these are actually distinct inquiries.  It may be that these are merely two ways to look at the same issue.  But in an attempt to follow the reasoning of *Lowe* and for thoroughness, the Court will address them separately.

14

this controls here, where VaughanAir's contractual right to veto any settlement makes DuraSystems's relation to the litigation one of obligation, not right. DuraSystems responds with a citation to *Speedplay*, where the court held that a patent transferor's right to veto a further patent assignment, when subject to a reasonableness restriction, did not mean the transferee lacked substantial rights in the patent. 211 F.3d at 1251–52. It follows, DuraSystems asserts, that a consent requirement does not negate the existence of rights when it is subject to a reasonableness restriction.

Neither of these cases control. First, the circumstances of the contracts at issue were different. In both *Propat* and *Speedplay*, the Federal Circuit considered contracts that transferred the right to license a patent while the transferor retained a right to veto a future license. *See Propat*, 473 F.3d at 1191; *Speedplay*, 211 F.3d at 1251. In this case, by contrast, the right in question is the right to veto a settlement, not the right to veto licenses, and the right in question was *transferred*, not retained. As a result, the mix of rights and obligations at issue here is substantially different than those implicated by the cases the parties cite. More importantly, both cases were decided pre-*Lone Star*. Both cases analyzed whether a party could hold "all substantial rights" to a patent if the exercise of those rights was subject to a consent requirement. This is no longer the test. Whether DuraSystems has "all substantial rights" to the '569 patent does not control whether or not it has standing in this case. As a result, the effect of the consent requirement does not decide whether DuraSystems has Article III standing.

Instead, pursuant to the Federal Circuit's instructions in *Lowe*, whether DuraSystems has standing to continue this litigation depends on whether it has "express[ly] and unambiguous[ly]" transferred its right to the litigation. *Lowe*, 2025 WL 893211, at *5. This is a question of contract interpretation.

The Court must first determine what law governs the Court's interpretation of the Agreement. The Agreement itself provides an answer: "This Agreement and all disputes or controversies arising out of or relating to this Agreement and the Transaction shall be governed by, and construed in accordance with, the laws of the Province of Ontario . . . ." Agreement § 12.9. "[C]hoice of law clauses are presumptively valid where the underlying transaction is fundamentally international in character." *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362 (2d Cir. 1993); *Lipcon v. Underwriters at Lloyd's, Lond.*, 148 F.3d 1285, 1295 (11th Cir. 1998); *cf. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (holding that forum-selection clauses in international contracts should control "absent a strong showing that it should be set aside"). Because both parties to the Agreement—VaughanAir and DuraSystems—are Canadian corporations, it is properly considered "international in character." The choice of law provision is thus presumptively valid. The presumption may be overcome only by a clear showing that the choice of law clause is "unreasonable under the circumstances." *Roby*, 996 F.2d at 1363 (quoting *M/S Bremen*, 407 U.S. at 10). Such circumstances include:

> (1) if their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will for all practical purposes be deprived of his day in court, due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state.

*Roby*, 996 F.2d at 1363 (quotation marks omitted) (citing *M/S Bremen*, 407 U.S. at 12–13, 15, 18; *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991)). There is no indication that any of these circumstances exist in this case. As a result, the Court applies Ontario law to interpret the Agreement.[5]

---

[5] Unlike the United States, Canada does not have parallel provincial and federal courts. Instead, the provincial courts are part of a single court system that feeds to the Supreme Court of Canada. Consequently, decisions by the Supreme Court of Canada are binding on Ontario courts and decide Ontario law. The Court of Appeal for Ontario is

Unlike in the United States, contract interpretation in Canada is considered a mixed question of law and fact.  *Sattva Cap. Corp. v. Creston Moly Corp.*, 2014 SCC 53, ¶ 50 (Can.). This means the "surrounding circumstances" may be considered when interpreting a contract, though they should not "overwhelm the words of that agreement," nor should this rule be construed to allow parole evidence.  *Id.* ¶¶ 56–61.  The ultimate goal is "to ascertain the objective intentions of the parties."  *Id.* ¶ 49.

Applying these principles, the Court of Appeal for Ontario recently outlined the principles underlying contract interpretation.

> Contractual interpretation is an exercise in discovering the objective intentions of the parties as expressed in the words of the contract.  This fact-specific goal requires a trial court to read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract.  When a contract is read as a whole, it should be interpreted in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective. The exercise of interpretation should also reflect the factual matrix underlying the contract and accord with sound commercial principles and good business sense, while avoiding commercially absurd interpretations.  However, the surrounding circumstances should never be allowed to overwhelm the words of the agreement.

*Jakab v. Clean Harbors Can., Inc.*, 2023 ONCA 377, ¶ 11 (Ct. App. Ont.) (quotation marks and alterations omitted).  Alternatively stated, Ontario courts interpret a contract

(a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;

(b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they said;

(c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent there is any ambiguity in the contract),

(d) in a fashion that accords with sound commercial principles and good business sense, and that avoids a commercial absurdity.

---

the highest level of court in Ontario and creates binding law for the province where the Supreme Court of Canada is silent.  *See generally How the Courts are Organized*, Department of Justice Canada (Sept. 1, 2021), https://justice.gc.ca/eng/csj-sjc/ccs-ajc/02.html; *About the Court*, Court of Appeal for Ontario, https://www.ontariocourts.ca/coa/about-the-court/ (last visited Dec. 11, 2025).

*2249778 Ontario Inc. v. Smith*, 2014 ONCA 788, ¶ 19 (Ct. App. Ont.) (quotation marks omitted). Under the principle that contracts should be interpreted to accord with sound commercial principles, the Court of Appeal of Ontario has considered it relevant that one interpretation would have brought about absurd "practical consequences." *Joo v. Tran*, 2021 ONCA 107, ¶ 9 (Ct. App. Ont.).

Ontario courts have also given guidance on how to interpret a contract when two contractual provisions appear to conflict with each other. A contractual term is considered inconsistent if it "contradicts another [term] or is in conflict with it to such an extent that effect cannot be given to both." *Fuller v. Aphria Inc.*, 2020 ONCA 403, ¶ 57 (Ct. App. Ont.). "Where a contract contains apparently inconsistent terms, the court must first endeavour to reconcile them." *Id.* ¶ 59. "In reconciling apparent inconsistencies, the court favours terms that the parties appear to have tailored to their specific situation." *Id.* ¶ 60. That is, "where there is apparent conflict between a general term and a specific term, the terms may be reconciled by taking the parties to have intended the scope of the general term to not extend to the subject-matter of the specific term." *BG Checo Int'l Ltd. v. B.C. Hydro and Power Auth.*, [1993] 1 S.C.R. 12, 24 (Can.).

There is an apparent inconsistency in the agreement. A general term purports to transfer "all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Duct Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise." Agreement § 2.1. This is sweeping language.[6] It facially suggests that DuraSystems can no longer engage in any causes of action related to the transferred

---

[6] This subsection specifically excludes "all lease deposits, utility deposits, other deposits, and other prepaid expenses attributable to operation of the Duct Business prior to the Closing." Agreement § 2.2(c); *id.* § 2.1(f)) (starting with "except as set forth in Section 2.2(c)"). But this does not appear relevant to this case.

18

assets, that it will cease any ongoing litigation over the same (perhaps by substituting VaughanAir as the party in interest), and that it will not receive any payment from settlements or damages awards in any such actions.  The section on the "Van Packer Litigation" says the opposite.  Under its terms DuraSystems must "use its best efforts to prosecute the Van Packer Litigation and defendant protect the Challenged IP" and retains its entitlement to all damages awarded or settlement paid.  *Id.* at § 6.2.  While it certainly transferred to VaughanAir *some* rights to this litigation—namely the permission to participate and the ability to veto any settlement, subject to a reasonableness provision, *id.* (providing that VaughanAir cannot "unreasonably withh[o]ld consent to settle")—this section is inconsistent with a general clause transferring "all rights" to this action.  The question then is what to do with this inconsistency.

Applying the instructions of the Canadian Supreme Court and Court of Appeal of Ontario, the Court construes the general conveyance of rights of action to not extend to the Van-Packer litigation.  The rights of DuraSystems and VauganAir to this case are established by the section of the Agreement specific to the Van-Packer litigation.  Holding otherwise would allow the general clause to disturb the specific rights and obligations DuraSystems and VaughanAir bargained for.  As a result, DuraSystems never expressly and unambiguously transferred its right to this litigation.

This is consistent with an interpretation of the Agreement as a whole.  It is evident that the parties intended to outline their rights and obligations related to the Van-Packer litigation in express terms.  Holding that those extensive provisions are swallowed up by a short, generally-applicable clause would be unnatural, taking the Agreement as a whole.  Doing so would also arguably render the terms of the more specific section ineffective.  After all, at least in this case, if DuraSystems truly transferred the right to maintain this litigation then they legally could not

comply with their obligations under the Van-Packer litigation covenant. Even if 2.1(f) is interpreted as purporting to give VaughanAir the right to enter this litigation, such a right is at best redundant. VaughanAir received such permission *expressly* in 6.2. Finally, it would be at least strange, if not a commercial absurdity, for DuraSystems to have contracted away the utility of five years of litigation, or for VaughanAir to contract *for* the right to this Action when they do not receive any of the damages award.

Defendants urge the Court to interpret the Agreement as saying that DuraSystems transferred all *rights* to the litigation but retained the *obligation* to litigate. Mot. Dismiss 5. They suggest that, in order for it to be a right, DuraSystems must have the ability to either continue or decline to continue the litigation. But this does not cure the inconsistency. Even Defendants concede that DuraSystems retained the "right" to litigation proceeds when it contracted for an entitlement to all such payments. *See* Mot. Dismiss 5. The entitlement to litigation proceeds is unquestionably an element of the right to litigate, meaning it cannot be true that DuraSystems retained this entitlement while also transferring *all* rights in the litigation to VaughanAir. Defendants' proposed interpretation does not cure the inconsistency and does not properly apply Ontario's rules of contract interpretation.

Because the general transfer of rights to actions stemming from the duct business or the sold assets does not apply to the Van Packer Litigation, DuraSystems never expressly and unambiguously transferred its right to litigate this case. Since it was the party that owned the patent at the time of infringement, it therefore has standing to continue this case. This standing is rooted in its ownership interest in the '569 patent until June 24, 2024, that was not exhausted by the Agreement.

### ii.   Sufficiency of Contractual Right to Litigate under Article III

Even if, contrary to the guidance of the Canadian Supreme Court and Court of Appeal of Ontario, the general transfer clause of the Agreement is taken to transfer rights to the Van-Packer litigation, the Agreement also specifically carves out rights, not merely obligations, in relation to this litigation. And the specific rights that it has carved out are sufficient for DuraSystems to have standing rooted in its contractual rights.

The Agreement is properly understood to carve out rights, not only obligations. DuraSystems clearly contracted for the ability to continue this litigation and an "entitle[ment]" to any settlement or damages awarded in this case. *See* Agreement § 6.2. Both of these are properly considered rights, not obligations. The ability to sue is generally considered a legal right. *See, e.g.*, *Kenall Mfg. Co. v. Cooper Lighting, LLC*, No. 17 C 4575, 2020 WL 4015324, at *4 (N.D. Ill. July 16, 2020) (equating the "ability to sue for patent infringement" with a "right to sue"). The label "right" is especially applicable when, as here, the litigation is desirable for the plaintiff (evidenced by DuraSystems's voluntary initiation of this case in 2019) and the plaintiff benefits from the ability to sue. The ability to litigate can properly be considered a "right" even when that right is coextensive with an obligation. Such is the case for trustees, for instance. For at least some categories of trusts, trustees have "the right to sue on behalf of [the] trusts." *Godfrey v. Kamin*, 62 Fed. Appx. 693, 695 (7th Cir. 2003); *see also* Fed. R. Civ. P. 17(a)(1) (allowing "a trustee of an express trust" to sue in its own name). At the same time, trustees "have an independent fiduciary obligation to sue" to preserve trust assets. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 304 n.2 (2008) (Roberts, C.J., dissenting). Similarly here, DuraSystems has taken upon itself an obligation to vigorously litigate this case. But the existence of such an obligation does not mean it cannot simultaneously have a right to litigate. And with a respect to the settlement or damages, even defendants concede that the entitlement to

litigation proceeds is properly considered a "right." Mot. Dismiss 5. The question then is whether such rights are sufficient to confer standing upon DuraSystems or if they constitute a mere hunting license. Because the rights are integrally related to DuraSystems's former ownership interest in the '569 patent that was harmed by the infringement at issue here, this grant of rights does support DuraSystems's continued standing.

A "hunting license" is "a contractual arrangement that grants only the right to sue for infringement without any proprietary interest in the patent." *Lowe*, 2025 WL 893211, at *4. It cannot by itself create standing. *See Prima Tek II*, 222 F.3d at 1381 ("[A] 'right to sue' clause cannot confer standing on a bare licensee . . . ."); *Crown Die & Tool*, 261 U.S. at 42 ("The profits or damages for infringement cannot be sued for except on the basis of title as patentee, or as such assignee or grantee, to the whole or a part of the patent, and not on the basis merely of the assignment of a right to a claim for profits and damages, severed from such title." (quotation marks omitted)); *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1034 (Fed. Cir. 1995) ("A patentee may not give a right to sue to a party who has no proprietary interest in the patent.").

DuraSystems's right to maintain this suit is not a mere hunting license. To begin with, since *Lone Star*, the question of whether a party holds a mere hunting license is typically relevant to statutory standing, not constitutional standing. *See Lone Star*, 925 F.3d at 1233–35; *Ingenus Pharms., LLC v. Nexus Pharms., Inc.*, No. 22-cv-02868, 2025 WL 1311271, at *6 (N.D. Ill. May 6, 2025). More importantly, the concept of hunting licenses has primarily been invoked when a patent *licensee* is also transferred a right to sue. *See Prima Tek II*, 222 F.3d at 1374 (considering whether exclusive licensees have standing to maintain an infringement suit); *Ortho Pharm.*, 52 F.3d at 1028 (same); *Lone Star*, 925 F.3d at 1229 (considering whether exclusive licensees have

statutory standing).  Courts are concerned in that context that licensees do not have a sufficient interest in a patent to be considered injured by its infringement.  *See Crown Die & Tool*, 261 U.S. at 42 (expressing concern when right to sue for infringement is "severed" from an interest in the patent title).

The context here is importantly different.  The Agreement does not carve out a right to sue connected only to a relatively weak interest in the patent.  That is, DuraSystems did not contract for a mere license sue, or even a license to produce products, disconnected from an interest in the exclusionary rights of the patent.  Hunting licenses cannot create standing to sue for patent infringement because the injury inflicted by an infringement is of a particular type: "an invasion of the monopoly created by the patent."  *Id.* at 40 (quotation marks omitted).  Lacking as they do an exclusionary interest in the patent, those holding mere hunting licenses do not experience such harm.  Thus, the requirement that plaintiffs suffer an "injury in fact" to have standing is not satisfied.  DuraSystems's contractual right to sue, on the other hand, is connected to the undisputed proprietary interest it once held as patentee at the time of the infringement.  It held an exclusionary right as the patent owner which was infringed while it held the patent.

The Court in this case is presented with a patentee that held an undisputed proprietary interest in a patent and that was undisputedly injured by the infringement of the same.  When it transferred the patent to a third party, it expressly created a contractual regime where it would continue to prosecute the present suit and remained entitled to all payments resulting from the case.  Consequently, even if DuraSystems transferred its rights to all litigation to VaughanAir and carved out only limited rights to continue this litigation, such rights constitute more than a mere

hunting license because they are connected to an interest in the patent title. As a result, DuraSystems's contractual rights sufficiently support its standing to maintain this action.[7]

## CONCLUSION

Accordingly, Defendants Van-Packer Co. and Jeremias Inc.'s motion to dismiss for lack of standing, ECF No. 125, is DENIED.

Entered this 23rd day of December, 2025.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE

---

[7] In several places throughout their briefs, the parties use language relevant to "statutory standing"—the ability to maintain an action under 35 U.S.C. § 281. DuraSystems's argument that joinder of VaughanAir may be an appropriate remedy, for instance, *see* Resp. Mot. Dismiss 9–11, is only relevant if the defect is in statutory, not constitutional, standing. Defendants similarly use language applicable only to statutory standing. *See, e.g.*, Mot. Dismiss 4 (describing the implications of "transfer[ring] . . . all substantial rights in the patent").

However, the issue of statutory standing is not actually raised in the motion to dismiss and need not be considered by the Court. Indeed, Defendants seem to intentionally limit their motion to constitutional standing, not the requirements of 35 U.S.C. § 281. *See* Mot. Dismiss 4 (acknowledging that Article III Standing, which they believe is lacking "is distinct from analyzing whether a plaintiff is a 'patentee' under 35 U.S.C. § 281"). Moreover, the requirements of the Patent Act are not jurisdictional issues, so the power of the Court to hear this case is not implicated. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).